### A98A1071. BRANDON v. CLARK et al.
(510 SE2d 153)

RUFFIN, Judge.

Mary Lynette Clark and her son, Albert Clark, Jr., purchased a shrimp boat from Ben Brandon, Jr. The Clarks sued Brandon, alleging that they paid more than the agreed amount and were entitled to the amount of the overpayment, plus interest. Brandon filed a counterclaim for breach of contract, alleging that the Clarks had not paid the entire purchase price. The trial court granted the Clarks' motion for a directed verdict on Brandon's counterclaim, and the jury returned a verdict for the Clarks on their main claim. Brandon appeals, asserting that the trial court erred in directing a verdict for the Clarks and in charging the jury. We affirm.

1. Brandon contends that the trial court erred in directing a verdict on his counterclaim because there was a conflict in the evidence regarding the parties' understanding of the contract. "A motion for directed verdict is proper where there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. OCGA § 9-11-50 (a). In determining whether any conflict in the evidence exists, the court must construe the evidence most favorably to the party opposing the motion for directed verdict. The standard used to review the grant or denial of a directed verdict is the any evidence test." (Punctuation omitted.) *Hanover Credit Corp. v. Datamatx, Inc.*, 226 Ga. App. 12, 13 (485 SE2d 571) (1997).

Viewed in this light, the evidence at trial showed that on Decem-

ber 7, 1988, the parties signed an agreement, in Brandon's handwriting, stating that "I [Brandon] agree to sell the [shrimp boat] 'Captain Seagle' for $210,000 to Mary L. and Albert (Jeb) Clark, Jr. with one half the down payment (approximately $20,000) to be paid me at closing and the other half in approximately 6 months."

On January 19, 1989, the parties entered into a subsequent written agreement setting forth in more detail the terms of their agreement. In relevant part, this agreement provided that the Clarks would (1) make a cash payment of $35,000 to Brandon at closing, (2) "assum[e] . . . responsibility for the ship mortgage on [the shrimp boat] held by Production Credit Association (approximately $161,500)," (3) make a cash payment of $5,000 to Brandon within six months of closing, and (4) make a "[c]ash payment of the difference between the agreed upon selling price of $210,000 and the sum of $40,000 plus the outstanding cash principal owed to Production Credit Association at the time of closing."

On January 20, 1989, the Clarks paid Brandon $35,000, pursuant to section 1 of the agreement. On August 12, 1989, the Clarks paid Brandon an additional $5,518.04, representing the payment due under section 3 of the agreement, plus accrued interest.

On March 2, 1989, pursuant to section 2 of the agreement, the Clarks entered into a loan assumption agreement with South Atlantic Production Credit Association (PCA), the holder of the ship mortgage on the vessel. In this assumption agreement, the Clarks assumed liability on the promissory note secured by the boat. The agreement recited that "the balance due and outstanding with respect to said Note upon the date of this Agreement is $179,496.03." Brandon's brother, Richard L. Brandon, was also a party to the assumption agreement, as he was the original borrower under the promissory note. The Clarks subsequently paid off the loan in full, writing checks to PCA in the aggregate amount of $238,275.74.

Although the Clarks did not make any payment to Brandon pursuant to section 4 of the agreement, no payment was due under that section. Section 4 required the Clarks to make a payment equal to the difference between (i) $210,000 and (ii) the sum of $40,000, plus the outstanding cash principal owed to PCA at the time of closing. At the time of the agreement, the parties estimated that the amount owed on the PCA note was $161,500, which would have meant that the Clarks were required to make an additional payment of $8,500. However, as discussed above, the principal amount owed to PCA at closing was actually $179,496.03. Therefore, the amount the Clarks owed under section 4 was a negative number. Regardless of whether the Clarks were entitled to a refund of any amount under this section, it is clear that Brandon was not entitled to any additional payment.

Brandon contends that the actual amount owed under the PCA note was in fact $161,500, and not $179,496.03. The discrepancy between the two numbers is apparently due to the fact that PCA is a cooperative association. As such, when a borrower takes out a loan, he receives shares of stock in the association. When the borrower pays off the loan in full, the association repurchases the shares of stock. Alternatively, the borrower can satisfy the loan by surrendering his shares of stock and by paying the difference between the loan amount and the stock price. At the time Richard Brandon executed the original promissory note, he received shares of stock in the association. Although the Clarks assumed Richard Brandon's obligations under the note, they did not obtain an assignment of the shares of stock. Therefore, when the Clarks paid off the loan in full, PCA repurchased the stock from Richard Brandon, and not from the Clarks.

Ben Brandon contends that for purposes of computing the payment owed under section 4 of the agreement, the principal amount owed on the loan should be deemed to be $161,500, representing the difference between the $179,496.03 loan amount and the value of the stock. This contention is without merit. Section 4 refers to the "outstanding cash principal owed to [PCA]." As PCA's representative testified, the amount outstanding on the loan was $179,496.03, notwithstanding the fact that the original borrower, Richard Brandon, owned shares of stock in the association. Although those shares might be redeemable by their owner, this does not change the balance outstanding on the loan. Nothing in the parties' agreement indicates that the value of stock owned by Richard Brandon was to be subtracted from the principal outstanding under the loan in determining the amount of any payment to be made by the Clarks. Indeed, section 2 of the agreement required the Clarks to assume the *entire* amount due under the loan, and not merely the amount of the loan less the value of outstanding stock owned by someone else. Because the Clarks did not own the stock, they were not entitled to any credit when they paid off the loan. It stands to reason that the Clarks would thus be given credit for this entire amount when calculating the payment due under section 4.

Because the evidence conclusively demonstrated that the Clarks owed nothing under section 4, and because they made all other payments required under the agreement, the trial court did not err in granting a directed verdict on Brandon's counterclaim.

2. Brandon contends that the trial court erred in charging the jury regarding unjust enrichment and in failing to give his requested charge numbers 2, 3, 5, and 6.

Although Brandon raised objections to the court's proposed charge during the charge conference, he failed to renew his objections

after the court gave its charge. Indeed, after charging the jury, the trial judge asked for any objections, and Brandon's attorney responded, "None, your honor." Accordingly, Brandon has waived his right to raise these issues on appeal. See *Smith v. Curtis*, 226 Ga. App. 470, 471 (1) (486 SE2d 699) (1997); *Shaw v. Ruiz*, 207 Ga. App. 299, 300 (2) (428 SE2d 98) (1993).

*Judgment affirmed. Pope, P. J., and Beasley, J., concur.*

DECIDED DECEMBER 4, 1998.

*John S. Myers*, for appellant.
*Killian & Boyd, Robert P. Killian*, for appellees.