A02A0668. LIFESTYLE FAMILY, L.P. et al. v. LAWYERS TITLE INSURANCE CORPORATION.
(568 SE2d 171)

MIKELL, Judge.

In this dispute over real estate brokerage commissions, Lifestyle Family, L.P. and Mansour Properties, LLC ("Lifestyle Mansour") appeal a judgment entered on a jury verdict in favor of Ben Carter Holdings, Inc. ("Carter") and a directed verdict entered in favor of Southeastern Partners, Inc. ("Southeastern"). For the reasons that follow, we reverse the judgment for Carter and affirm the directed verdict for Southeastern.

Evidence adduced at trial shows that the underlying transaction began in 1996, when the Eastern Airline Pension Fund ("Eastern") retained Carter, a brokerage firm, to procure a buyer for a 130-acre parcel of land in Gwinnett County. Stanley B. Ashley, Jr., CCIM,[1] a broker associated with Carter, testified that he represented Eastern. Lifestyle Mansour began negotiating with Ashley to purchase the parcel. Meanwhile, Ashley received an inquiry from David Thomas, CCIM, a broker associated with Southeastern, acting on behalf of a prospective buyer, Unisource Worldwide, Inc. ("Unisource"). Unisource was interested in acquiring a 30-acre portion of the property known as the Governor's Lake Tract ("the Tract"). However, Eastern wished to sell the 130-acre parcel as a whole.

On May 17, 1996, Eastern and Lifestyle Mansour reached an

---

[1] Certified Commercial Investment Member.

agreement for the sale of the parcel for $3.5 million. Ashley testified that prior to finalizing the agreement, he informed Lifestyle Mansour of Unisource's interest in purchasing the Tract. According to Ashley, Sam Leveto, Lifestyle Family, L.P.'s principal, "specifically requested that I try to obtain a new offer out of Unisource. . . ."

Ashley further testified that Thomas contacted him and expressed Unisource's continued interest in the Tract. Ashley conveyed this interest to Leveto, who asked Ashley to solicit a written offer from Unisource. On June 4, 1996, Thomas submitted to Ashley a letter of intent reflecting Unisource's offer to purchase the Tract for $2.25 million. The letter stated that Southeastern "shall look to the seller to pay a commission of 10% of the purchase price," which Southeastern and Carter would divide equally. Ashley testified that he faxed the letter to Leveto and arranged a meeting on behalf of Lifestyle Mansour with Unisource and Thomas. Both Ashley and Thomas testified that at the meeting, Lifestyle Mansour expressed an interest in selling the Tract to Unisource but deferred negotiating details until after closing the deal with Eastern. Commissions were not discussed.

The sale of the 130-acre parcel closed on July 10, 1996. Lifestyle Mansour then contacted Thomas and invited him to Leveto's office to discuss Unisource's offer. To Thomas's "great surprise," Ashley was not present when he arrived. Moreover, Leveto and George Mansour, manager of Mansour Properties, LLC, informed Thomas that Ashley was not involved in the transaction and did not represent them, that they had not agreed to pay him a commission, and that they did not want to work with him. "The indication was that if he was in the deal, they didn't want to go forward with it," Thomas testified. In addition, Leveto and Mansour demanded $100,000 an acre, or $3 million, for the Tract, and offered to pay Southeastern a commission of only $80,000.

Thomas wrote Leveto and Mansour a letter memorializing the meeting, expressing shock at the amount of the commission they offered. Thomas also wrote that he notified Ashley that he was dealing directly with Leveto and Mansour and would pay Ashley a referral fee.

Upon receipt of the letter, Ashley arranged another meeting with Mansour and Leveto to discuss the commission issue. Mansour and Leveto were unwilling to pay ten percent. However, Ashley testified, they told him they wanted to think about it over the weekend and would get back to him. According to Ashley, they never did.

Thomas testified that Lifestyle Mansour ultimately agreed to pay him a brokerage commission of $110,000. Thomas signed a proposal, drafted by Mansour, agreeing to accept that sum and to "pay [Carter] their portion of the commission as may be due to them."

Thomas believed that Ashley continued to negotiate with Mansour and Leveto concerning Ashley's commission.

On August 30, 1996, Lifestyle Mansour executed an agreement to sell the Tract to Unisource for over $3 million. The contract named Southeastern "Broker" and Carter "Referring Broker." It provided that Lifestyle Mansour would pay Southeastern a brokerage commission of $110,000, Southeastern would hold Lifestyle Mansour harmless from claims of any other brokers, and Southeastern would be responsible for paying Carter "its share of commission as agreed upon" between them. Neither Southeastern nor Carter was a signatory to the agreement.

Thomas testified that he never agreed to hold Lifestyle Mansour harmless from Carter's commission claims, that Carter did not authorize Thomas to agree to a commission, and that he did not read the commission paragraph. Ashley testified that he did not receive a copy of the agreement until suit was filed.

The sale of the Tract to Unisource closed in March 1997. Thomas testified that he did not attend the closing but was asked to sign the documents at a later date. Thomas executed a "Final and Unconditional Waiver and Release of Lien," waiving any claims against Lifestyle Mansour and Unisource in exchange for $110,000. This sum, plus an additional $40,499.28 contributed by Lifestyle Mansour, was placed in escrow with Lawyers Title Insurance Corporation pending resolution of the commission issue.

Thomas testified that based on Lifestyle Mansour's request that he try to resolve the matter with Ashley, he offered Ashley 20 percent of the $110,000 commission, or $22,000, as a referral fee. In August 1997, Mansour wrote Thomas a letter urging him to split the commission with Carter because "it is indisputable that [Carter] facilitated and arranged . . . the bringing together of the buyer and the seller which ultimately led to the closing of the property. . . ." By this time, Thomas was aware that Carter claimed it was due a $150,000 commission.

Settlement negotiations failed, and Lawyers Title interpleaded the escrowed funds into court. Lifestyle Mansour filed a cross-claim against Carter, Southeastern, and the funds, asserting theories of fraud, fraudulent inducement, and breach of contract. Carter filed a cross-claim against Lifestyle Mansour and Southeastern, seeking to recover a commission under theories of procuring cause and breach of contract (Count 1), as well as quantum meruit (Count 2). Southeastern filed a cross-claim against Carter, asserting that Carter was not entitled to any portion of Southeastern's commission. Southeastern also sought recovery of $110,000 of the interpleaded funds. The trial court dismissed Lawyers Title from the action and realigned the parties thusly: Carter as plaintiff, Lifestyle Mansour as defendants, and

Southeastern as third-party defendant. The day before trial, Carter and Southeastern reached an agreement to divide any recovery equally.

At the conclusion of the evidence, the trial court directed a verdict for Southeastern in the amount of $110,000. Carter's claim was submitted to the jury on alternate theories of breach of contract and quantum meruit. The jury returned a verdict in Carter's favor on the breach of contract claim, awarding $150,000 in damages. The jury also found that no indemnification agreement existed between Southeastern and Lifestyle Mansour. Judgment was entered on the verdict.

Lifestyle Mansour filed a motion for judgment notwithstanding the verdict ("judgment n.o.v.") against Southeastern and for a new trial against Carter. The trial court denied both motions. This appeal followed.

1. Lifestyle Mansour contends that the trial court should have granted its motion for new trial on the breach of contract claim because there is no evidence that it entered into a contract with Carter to pay a ten percent brokerage commission. We agree.

Although an oral contract for a brokerage commission is valid,[2] such a contract is not complete and enforceable until there is a meeting of the minds as to all essential terms.[3] And although the appellate court will not disturb the trial court's refusal to grant a new trial if there is any evidence at all to support the verdict,[4] a careful review of the transcript in the instant case reveals no evidence of a meeting of the minds between Lifestyle Mansour and Carter as to the amount of the commission. Ashley testified that after receiving the offer from Unisource, he faxed it to Leveto; that the fax expressed the ten percent brokerage commission that Carter and Southeastern anticipated receiving and sharing equally; that Leveto subsequently instructed Ashley to arrange a meeting with Unisource; and that at the meeting, Leveto did not raise an objection to the proposed com-

---

[2] See *Perimeter Realty v. GAPI, Inc.*, 243 Ga. App. 584, 589 (1) (a) (533 SE2d 136) (2000). Moreover, prior to its amendment in 2000, the Brokerage Relationships in Real Estate Transactions Act, OCGA § 10-6A-1 et seq., defined a "brokerage engagement" as an "express written or oral contract wherein the client promises to pay the real estate broker a valuable consideration . . . in consideration of the broker producing a . . . buyer . . . ready, able, and willing to . . . buy . . . the property." Ga. L. 1993, p. 378. OCGA § 10-6A-3 (4) was amended in 2000 to require such contracts to be in writing.

[3] Under OCGA § 13-3-1, the plaintiff in a breach of contract action has the burden of proving three elements: subject matter of the contract, consideration, and mutual assent by all parties to all contract terms. *Lamb v. Decatur Fed. Sav. &c. Assn.*, 201 Ga. App. 583, 585 (1) (411 SE2d 527) (1991); see also OCGA § 13-3-2; *Clark v. Schwartz*, 210 Ga. App. 678, 679 (436 SE2d 759) (1993).

[4] *BM&J Contractors v. Liberty County Bd. of Ed.*, 226 Ga. App. 110, 111 (485 SE2d 262) (1997).

mission. However, there is no evidence that Lifestyle Mansour agreed to pay that percentage.[5] And although there is evidence that these parties continued to negotiate the commission rate, no agreement was ever reached. For this reason, the verdict is not sustainable.

A case on point is *Perimeter Realty v. GAPI, Inc.*,[6] which involved a suit by two brokers to recover real estate commissions. In that case, there was evidence that the buyer and seller proceeded to negotiate the sale without the brokers after the brokers brought them together. Moreover, the seller never signed the written commission agreement drafted by the brokers and continued to propose a lesser fee. The brokers agreed to share a commission, but the seller proceeded to negotiate the sale directly with the buyer and paid the brokers nothing after the transaction closed. In affirming the denial of summary judgment to the brokers, we held that the evidence did not demonstrate the existence of an enforceable oral agreement because certain essential terms were missing.[7]

Except for the procedural posture, *Perimeter Realty v. GAPI, Inc.* is squarely on point with the instant case. In this case, the essential term missing from the brokerage agreement is the amount of the commission, and there is no evidence of a meeting of the minds on that issue. *Gibbs v. Brown*,[8] relied on by Carter in support of its argument that Lifestyle Mansour agreed to pay a ten percent commission, is distinguishable. There, the agent presented evidence that his commission was discussed at various meetings, and it does not appear that the actual percentage was in dispute.[9] The evidence here was that the percentage was hotly disputed. It follows that *Gibbs* is inapposite.

Moreover, the jury was given a special verdict form from which it was permitted to find either that a contract existed or that Carter should recover in quantum meruit. As the jury found that a contract had been formed, and we find no evidence to sustain the verdict, the trial court's denial of Lifestyle Mansour's motion for a new trial must be reversed.

2. Nevertheless, we hold that a retrial is authorized on the theory of quantum meruit. In this regard, we reject Lifestyle Mansour's argument that the Brokerage Relationships in Real Transactions Act ("BRRETA") eviscerates a broker's right to recover commissions

---

[5] Cf. *American Global Dev. Group v. Sasser & Weatherford, Inc.*, 249 Ga. App. 479, 482-483 (3) (548 SE2d 465) (2001).

[6] Supra.

[7] Id. at 589.

[8] 154 Ga. App. 611 (269 SE2d 102) (1980).

[9] Id. at 612 (1).

under any common law theory except breach of an express contract.

Statutes adopted in derogation of the common law must be strictly construed.[10] "Unless the contrary manifestly appears from the words employed, the language of a [C]ode section should be understood as intending to state the existing law, and not to change it."[11] The common law "procuring cause" doctrine[12] applies where, as here, there is no express contract governing the conditions under which a commission is to be paid.[13] A broker makes out a prima facie case that he was the procuring cause of a sale "when he shows that negotiations for the sale were set on foot through his efforts, that he performed every service required by his employment which it was possible to perform, and that the failure on his part to personally consummate the trade was due to the interference of the defendant."[14] BRRETA does not change this concept. Rather, it was enacted to "codify the way relationships actually operate within the real estate industry and to distinguish the 'limited agency' relationship in real estate transactions from common law agency."[15] Moreover, although our appellate courts have not yet addressed this precise issue, the Colorado Court of Appeals has determined that its version of BRRETA was not intended to supplant existing law pertaining to brokerage relationships.[16] Specifically, the court ruled that BRRETA did not eradicate the common law concept of procuring cause because nothing in the statutory scheme addressed the issue.[17] We agree with this reasoning and hold that BRRETA does not preclude recovery under a quantum meruit theory or the procuring cause doctrine.[18]

We also reject Lifestyle Mansour's argument that Carter is barred from recovering a commission because it acted as a dual agent without disclosing that fact. BRRETA defines a "dual agent" as a bro-

---

[10] *DeKalb County v. Post Apt. Homes*, 234 Ga. App. 409, 410 (1) (506 SE2d 899) (1998).

[11] (Citation and punctuation omitted.) *Bd. of Assessors &c. v. McCoy Grain Exchange*, 234 Ga. App. 98, 100 (505 SE2d 832) (1998).

[12] OCGA § 10-6-32 provides that the "broker's commissions are earned when, during the agency, he finds a purchaser who is ready, able, and willing to buy and who actually offers to buy on the terms stipulated by the owner."

[13] *B & R Realty v. Carroll*, 245 Ga. App. 44, 45 (2) (a) (537 SE2d 183) (2000).

[14] (Citation omitted.) *Perimeter Realty v. GAPI, Inc.*, supra at 596 (11).

[15] See Sullivan, Brokerage Relationships in Real Estate Transactions: Provide Codification of the Relationships Between Real Estate Brokers and Consumers of Brokerage Services, 10 Ga. St. U. L. Rev. 23 (1993).

[16] *Telluride Real Estate Co. v. Penthouse Affiliates*, 996 P2d 151 (Colo. App. 1999).

[17] Id. at 154 (II).

[18] To recover under a quantum meruit theory, a broker must demonstrate: (1) . . . performance as agent of services valuable to the defendants; (2) either at the request of the defendants or knowingly accepted by [them]; (3) the defendants' receipt of which without compensating [the broker] would be unjust; (4) . . . expectation of compensation at the time of the rendition of the services; (5) and that [the broker was] the procuring cause of the completed transaction. *Perimeter Realty v. GAPI, Inc.*, supra at 596 (11).

ker who "has a client relationship with both seller and buyer . . . in the same real estate transaction."[19] The evidence in this case shows that Carter acted on behalf of Lifestyle Mansour in its transaction with Unisource. The fact that Carter represented Eastern in a separate transaction with Lifestyle Mansour is irrelevant to this issue. Carter did not act as a dual agent.

Finally, we note that the record is replete with evidence warranting a recovery for Carter in quantum meruit. For example, Lifestyle Mansour's August 1997 letter to Thomas reads in pertinent part:

> While Stan Ashley may not have had the exclusive right to list the property, it is indisputable that Mr. Ashley facilitated and arranged for the meeting between the buyer and the seller of the property. . . . As far as I'm concerned, both Stan Ashley and yourself facilitated the bringing together of the buyer and the seller which ultimately led to the closing of the property and the payment of the $110,000 commission.

In light of this letter, Lifestyle Mansour would be hard pressed to deny that Carter was a procuring cause of the transaction. Moreover, the purchase agreement between Lifestyle Mansour and Unisource acknowledges Carter as a broker in the transaction. Accordingly, upon retrial, Carter may pursue a quantum meruit claim..

3. Lifestyle Mansour contends that the trial court erred in refusing to give its requested charge no. 14. As the claim must be retried, we will address the enumerated error.

"A request to charge itself must be correct, legal, apt, even perfect, and precisely adjusted to some principle involved in the case. If *any portion* of the request is inapt or incorrect, denial of the request is proper."[20] The first sentence of Lifestyle Mansour's requested charge states that the "broker's commissions are not earned until . . . the owner makes an unconditional offer to sell and it is accepted by a purchaser found by [the broker]."[21] This principle has no application to the facts of the case at bar. Here, the owner intentionally excluded the broker from the transaction despite the broker's attempt to secure a satisfactory offer from the purchaser. Therefore, the trial court did not err in refusing to give the requested charge.

---

[19] OCGA § 10-6A-3 (10).

[20] (Citations and punctuation omitted.) *Mattox v. MARTA*, 200 Ga. App. 697, 699 (4) (409 SE2d 267) (1991).

[21] *Morgan v. Siegal*, 135 Ga. App. 559, 560 (1) (218 SE2d 280) (1975).

4. Finally, Lifestyle Mansour argues that the trial court erred in directing a verdict for Southeastern on its claim for a $110,000 commission. We disagree.

"A directed verdict is proper where there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, demands a particular verdict."[22] In determining whether any conflict in the evidence exists, the court must construe the evidence most favorably to the party opposing the motion for directed verdict.[23]

Lifestyle Mansour claims a conflict in the evidence exists as to whether Southeastern fully performed its contractual obligations in the letter agreement dated August 28, 1996. The letter, which was drafted by Mansour and addressed to Thomas, states in part:

> If you secure a contract acceptable to me, I agree to pay [Southeastern] a commission of $110,000 from the proceeds of closing. It is understood you shall pay [Carter] their portion of the comission [sic] as may be due to them. You shall hold harmless Buyer and Seller from any claims from other brokers due to your actions, and we shall hold you harmless from any claims caused by our actions, except [Carter].

Lifestyle Mansour does not dispute that the evidence conclusively demonstrates that Southeastern secured an acceptable contract, for which it was owed a commission of $110,000. Rather, Lifestyle Mansour claims that because Southeastern did not pay Carter any portion of its commission, a jury issue was created on Lifestyle Mansour's breach of contract claim. This argument ignores the fact that the trial court submitted the indemnification claim to the jury.

In directing the verdict, the trial court recounted Mansour's testimony as follows:

> The court: He added he was his broker. He admitted he found him a buyer. He admitted that they negotiated a commission to $110,000, and he admitted that he paid the $110,000. Now, to what extent did he not perform his contract, and the sale closed according to the terms negotiated by Mr. Thomas, along with Unisource, and Mansour and Leveto? So how is there any contest over whether Thomas and Southeastern [are] entitled to this $110,000?
> Mr. Hughes: Your Honor, they may — I'll have to draw a [distinction] here.

---

[22] *Grier v. Brogdon*, 234 Ga. App. 79 (1) (505 SE2d 512) (1998); OCGA § 9-11-50 (a).
[23] *Brandon v. Clark*, 235 Ga. App. 614 (1) (510 SE2d 153) (1998).

The court: They may be entitled to —.

Mr. Hughes: Subject to a right [of] set off.

The court: We don't have set off. We have indemnification. . . . Whether or not it's valid, that has nothing to do with whether he's supposed to be paid [$110,000].

The construction of a contract is a question of law for the trial court, and our review of the court's interpretation is de novo.[24] Southeastern's obligation to pay Carter such "portion of the commission as may be due to them" was not a condition precedent to the formation of the contract, and Southeastern's entitlement to a commission was not contingent upon it.[25] Rather, that clause related to Southeastern's agreement to hold Lifestyle Mansour harmless from any of Carter's commission claims, and this issue was submitted for jury resolution. There was no error.

5. The remainder of Lifestyle Mansour's enumerated errors are rendered moot by our holding in Division 1.

*Judgment affirmed in part and reversed in part. Andrews, P. J., and Phipps, J., concur.*

DECIDED JULY 2, 2002.

*Alston & Bird, William H. Hughes, Jr.,* for appellants.

*Sutherland, Asbill & Brennan, Richard L. Robbins, Julianne N. Belaga, Deborah M. Danzig, Foltz & Martin, Kevin H. Hudson,* for appellee.

---

[24] *Deep Six v. Abernathy*, 246 Ga. App. 71, 73 (2) (538 SE2d 886) (2000).

[25] See OCGA § 13-3-4; see generally *Sheridan v. Crown Capital Corp.*, 251 Ga. App. 314, 318-319 (2) (554 SE2d 296) (2001) (discussing conditions precedent and subsequent).