A02A2181. CLINE v. LEE.
(581 SE2d 558)

ADAMS, Judge.

Bobby Lee filed suit against Charles Cline, Anne Cline, Narda Mullinax, Ray Williams and ReMax Realty Group, Inc. alleging claims for breach of fiduciary duty, breach of contract and fraud in connection with the development and build-out of the Magnolia Ridge subdivision in Bartow County. At trial, the judge granted Williams' motion for directed verdict. The jury subsequently awarded Lee compensatory and punitive damages against Charles Cline in the total amount of $73,750[1] and compensatory damages against ReMax in the amount of $6,000. The jury found in favor of Anne Cline and Mullinax. Charles Cline is the only party to appeal. For the reasons set forth below, we affirm in part and reverse in part.

The evidence showed that Charles Cline and his brother, Larry Cline, were longtime friends with Lee. In November 1996, Charles Cline purchased land in Bartow County for development as the Magnolia Ridge subdivision. Lee testified that sometime in 1997 he approached Charles Cline about subcontracting the foundation walls and the grading work for the subdivision. At the time, Charles Cline was looking for builders, and he and his wife, Anne, tried to persuade Lee to become a builder on the project. Although initially reluctant, Lee agreed to become a builder after Charles Cline represented that neither he nor his wife would be acting as builders. Charles Cline agreed that his role would be restricted to that of a developer. Larry Cline also agreed to be a builder based upon this representation. Both Larry Cline and Lee testified that this was an important point because they did not want to compete with a developer, who has an

---

[1] The jury awarded $26,000 on Lee's breach of contract claim, $16,000 on the fraud claim and $31,750 in punitive damages.

advantage over other builders in owning the land and managing the project.

The parties agreed that Charles Cline would enter into an exclusive listing agreement with ReMax and Donny Ray, as the agent. Both Larry Cline and Lee testified that this was also an important factor in inducing them to become builders on the project. Both men had known Ray for some time and considered him to be honest. They believed that he would treat them fairly.

Larry Cline and Lee each began building on one lot in the subdivision prior to the division of the remaining building lots. The parties agreed that each builder would be assigned five additional lots through a random drawing. On the morning of the drawing, Larry Cline and Lee learned for the first time that Charles's wife, Anne, would be participating in the drawing as a builder. Lee testified that when he saw that Anne Cline was drawing lots with the other builders, he "knew Charles was going to build" because Anne was not experienced as a builder on her own. Prior to the drawing, Lee had purchased and built on only one lot. He acknowledged that he could have walked away from the deal at that point without purchasing additional lots. Nevertheless, Lee decided to go forward based upon three factors: (1) Ray's involvement as real estate agent, (2) Charles Cline's admonishment to Ray to treat everyone fairly or he would be fired and (3) the fact that he already had his trucks and forms on site.[2] He said that at that point he already had $150,000 to $160,000 invested in the subdivision, including the house he had built, his equipment and concrete forms.

Nevertheless, Charles Cline continued to maintain that he would not act as a builder. And to allay any concerns about Anne Cline's role as a builder, Charles Cline told Ray on the day of the drawing that Ray had to treat all the builders fairly or he would be fired as the realtor on the property. Despite Charles Cline's contention that he was not acting as a builder, the evidence at trial demonstrated that Anne Cline had never built a "spec house" by herself prior to the Magnolia Ridge subdivision. Moreover, for each property Anne Cline sold in the subdivision, Charles Cline was listed as a co-seller and shared in any profits. Every check on an Anne Cline house was written on Charles Cline's corporate account. The building materials for the Anne Cline houses were billed to her, but paid for with checks from Charles Cline's corporation.

Three ReMax agents, Ray, Evelyn Goodwin and Mullinax, were initially assigned to show Magnolia Ridge property. Within a short

---

[2] Although there was evidence of "majority rule" as a term of the parties' agreement, neither Larry Cline nor Lee testified that it was an inducement for them to become a builder on the project.

time, Larry Cline and Lee began experiencing what they perceived to be unfair treatment by Mullinax in showing their properties. Larry Cline and Lee testified that Mullinax did not appear interested in showing properties belonging to them, but instead steered buyers toward Anne Cline's properties. Larry Cline also testified that Mullinax misrepresented to Charles Cline events surrounding a proposed sale of one of his lots.

Matters came to a head in October 1997 when Lee overheard Mullinax pointing out negative aspects of one of his properties to a prospective buyer. Lee later confronted Mullinax about the situation, and a heated exchange occurred. Lee testified that Mullinax then quit showing his properties and refused to speak to him. After that, Mullinax did not sell any of Lee's properties, although other ReMax brokers did. Following this confrontation, Lee asked to be released from the exclusive listing agreement, but Charles Cline refused, telling him he would have to talk to ReMax.

In late 1997, the three builders — Anne Cline, Larry Cline and Lee — met with Ray to discuss the situation. Larry Cline and Lee testified that Charles Cline had previously agreed that if any dispute arose regarding the agents, a decision by the majority of the builders would control. Both Larry Cline and Lee wanted Mullinax removed from the subdivision and Ray to stay on as the agent. Anne Cline wanted Goodwin removed. All the builders agreed that Goodwin was not marketing the properties aggressively enough, and she was removed from the listings. But Anne Cline told the others that it would be difficult to remove Mullinax because Charles Cline liked her. So although a majority of the builders wanted Mullinax removed, she remained on the listings. A short time later, Ray was removed from the listings.

Charles Cline testified that he did not believe his brother or Lee when they said that the agents were not showing their properties, even though one Magnolia Ridge property owner told him the same thing. He stated that there was no agreement that the majority would rule as to how the subdivision would be listed and marketed; rather, he controlled those decisions. He said that it was his decision to keep Mullinax.

Lee eventually contacted an attorney in an effort to work out the problems with the realtor. The attorney arranged a meeting between Lee, Charles Cline and Ray Williams on March 6, 1998. Williams is the broker at the ReMax office that handled Magnolia Ridge and is also Mullinax's father. At the meeting, Lee asked to be released from the exclusive listing agreement. Charles Cline and ReMax refused Lee's request. At trial, Lee's attorney testified that it appeared from the conduct of Charles Cline and Williams at the meeting that they were allied together against Lee. A short time later, Lee instructed

ReMax to remove their signs from his properties and he hired another real estate agent. By March 25, 1998, ReMax had released Lee from the exclusive listing agreement.

Lee also testified that on the last house ReMax handled for him, a ReMax agent did the final walk-through with the buyers even though they had their own agent. On the evening before the closing on the property, Mullinax handed Lee, without explanation, a 48-item punch list on the house. Lee decided to refund the buyer's escrow money in lieu of making the extensive list of repairs. But when he tendered a check to the buyers, they quickly backed off their requested repairs. Lee learned that the ReMax agent who was purportedly representing him in the transaction had suggested a number of the punch list items. At trial, the buyer testified that the agent had suggested at least six of the items.

Lee presented evidence of his damages in connection with the Magnolia Ridge development. He was forced to sell some of his property, including equipment and his concrete forms. He said he almost went bankrupt, but was able to honor his obligations to his creditors. He testified that he lost $27,000 to $28,000 in interest while his properties sat unsold, and he was forced to cut the price of his lots by $2,400 to sell them. He also testified that he incurred $22,000 in attorney fees. Lee further presented evidence from his tax preparer regarding lost profits.

Anne Cline testified that Larry Cline and Lee knew all along that she was going to be a builder and that Lee wanted to be a builder in the subdivision and required no persuasion. She also testified that she had primary responsibility for building her houses, although she acknowledged that she and her husband worked together and shared accounts.

Mullinax denied showing preferential treatment to any one builder in the subdivision. At trial, the defense introduced the ReMax "show cards" for Magnolia Ridge, which recorded when properties were shown to prospective purchasers. Although the cards showed that ReMax agents had shown both Larry Cline and Lee properties, they also reflect several instances where a customer expressed an initial interest in a Larry Cline or Lee property, but ReMax suggested an Anne Cline property or a pre-sale on an empty lot instead. On one occasion, Lee hired a private investigator to view homes in Magnolia Ridge. Although the investigator expressed an interest in Lee's homes, he was scheduled to see an Anne Cline home instead.

1. Charles Cline asserts that there was insufficient evidence to support the jury's finding that he had breached any contract with Lee. "Generally, in the absence of legal error, this Court affirms civil awards that are supported by any evidence." *C & F Svcs. v. First*

*Southern Bank*, 258 Ga. App. 71, 76 (3) (573 SE2d 102) (2002), citing *Walker v. Bruno's, Inc.*, 228 Ga. App. 589, 590 (1) (492 SE2d 336) (1997).

"Under OCGA § 13-3-1, the plaintiff in a breach of contract action has the burden of proving three elements: subject matter of the contract, consideration, and mutual assent by all parties to all contract terms." *Lifestyle Family, L.P. v. Lawyers Title Ins. Corp.*, 256 Ga. App. 305, 308 (1), n. 3 (568 SE2d 171) (2002). Lee asserts that he and Charles Cline had an agreement that he would operate as a builder in the Magnolia Ridge subdivision in consideration for the following promises from Charles Cline: (1) that he would not act as a builder; (2) that all builders would be treated equally; (3) that a majority of the builders would rule in the event a dispute arose over the real estate agent; (4) that Ray would be the exclusive listing agent and (5) that the parties would keep their prices low at first and then raise them later.[3]

There was no requirement that the contract be in writing. A contract may be enforceable even though it "rests only in words as remembered by [the] witnesses." OCGA §§ 13-1-5 (b); 13-1-6. And the agreement was not covered by the Statute of Frauds because it did not directly involve the sale or conveyance of an interest in land. See *Weatherby v. Barsk*, 248 Ga. App. 848, 851-852 (1) (545 SE2d 701) (2001). Moreover, nothing in the court's charge limited the jury to consideration of only written contracts.

Lee met his burden of establishing an agreement through his own testimony and that of Larry Cline. Although Charles and Anne Cline disputed the existence and terms of this agreement, the jury was not required to accept their version of events. And the jury was entitled to find based upon the evidence that Charles Cline had breached this agreement in several respects, including failing to honor the wishes of the other builders to remove Mullinax as a listing agent. We also find that there was sufficient evidence to support the jury's award of $26,000 in damages on Lee's breach of contract claim. Lee presented evidence that he lost at least that amount in interest and in lower sale prices on properties that sat on the market. Accordingly, we affirm the jury's verdict with regard to the breach of contract claim.

---

[3] Although Charles Cline introduced into evidence a short written agreement purportedly signed by Lee granting Cline the right to choose the real estate agent, Lee denied signing that agreement. Moreover, the agreement was dated February 20, 1998, a short time before Lee consulted an attorney to assist his removal from the ReMax listing agreement and a month before he actually was released. He testified that he did not know how his signature could have gotten on the document as he was not even speaking to Charles or Anne Cline at that time.

2. We agree with Charles Cline, however, that there was insufficient evidence to support the jury's finding of fraud. Lee contended that he was induced to become a builder on the project primarily in reliance upon Charles Cline's representation that he would not act as a builder. Pretermitting the issue of whether Lee could recover for both fraud and breach of contract under the facts of this case, we find that Lee failed to prove that he justifiably relied upon Charles Cline's misrepresentation to his detriment.

"The tort of fraud has five elements: a false representation by the defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by the plaintiff, and damage to the plaintiff." (Citation and punctuation omitted.) *Mustaqeem-Graydon v. SunTrust Bank*, 258 Ga. App. 200, 207 (5) (573 SE2d 455) (2002). Although Lee claimed to have relied on a promise that Charles Cline was not acting as a builder, he testified at trial that he knew on the morning of the lot drawing that Charles Cline was not keeping that promise. Thus, while the evidence may have supported a finding that Lee initially relied upon Charles Cline's representation that he would not act as a builder, by the time of the drawing, he could no longer justifiably rely upon that representation. And there was no evidence Lee suffered a loss from that initial reliance. At the time of the drawing, Lee had only one property, from which he derived a profit, and he agreed that he could have walked away from the project at that point. Further, he failed to establish that he suffered a loss from moving his equipment and forms on site. In fact, the evidence showed that he and his son used the equipment to grade lots and pour foundations for the other builders.

The properties on which Lee experienced losses were acquired with the knowledge that he would be competing with the developer in selling his houses. And although his decision to acquire additional properties was also based upon Charles Cline's agreement that Ray would be the listing agent, there was no evidence that Charles Cline misrepresented anything directly in connection with Ray. Ray was named on the exclusive listing agreement, as the parties agreed, and Lee presented no evidence that Charles Cline was involved in Ray's later removal from the listings.[4]

Accordingly, we reverse the jury's verdict with regard to the fraud claim. And because that leaves only the breach of contract claim, we also reverse the award of punitive damages. "It is well settled that punitive damages are not available in breach of contract

---

[4] Although Charles Cline may also have made other representations such as a promise of majority rule, neither Larry Cline nor Lee claimed to have relied upon those representations in deciding to become a builder.

claims." *ServiceMaster Co. v. Martin*, 252 Ga. App. 751, 757 (2) (c) (556 SE2d 517) (2001).

3. Charles Cline also asserts that the trial judge erred in discussing the elements of fraud with the jury in response to a question. Although we have reversed the jury's verdict on the fraud count, we will address this argument to the extent that Cline contends that this asserted error influenced the jury's deliberations as a whole. The trial judge's exchange with the jury is not on the record, but afterward, the trial court described it as follows:

Let the record reflect that I received a question from the jury regarding fraud, and the question was do they have to have all five elements for there to be fraud and my answer was yes. And they said, do we have all the elements, and they had their own chart where they had written down the elements of fraud. They had written down a false representation and under that, which the defendant knew to be false, and then under that they had language that substantially followed the second element of intent to deceive, intent to induce the plaintiffs to act on those statements, justifiable reliance, and damage. And looking at their chart, I said, yes, that they had the elements of fraud.

It is unclear from the record whether the trial court's exchange occurred in the presence of the jury and the parties, but nevertheless it appears that only the trial judge reviewed the jury's chart. Charles Cline's attorney objected on the ground that it did not appear that the chart accurately stated the element of scienter. He noted that, as represented by the trial judge, the chart did not state that the defendant had to know the representation was false at the time the representation was made. After discussing various options, the trial judge brought the jury back into the courtroom and recharged them on the elements of fraud. The trial judge began the recharge by noting that it was not intended to place additional emphasis on the fraud claim, but simply was given in response to the jury's question.

Charles Cline asserts that the trial judge's exchange with the jury was an improper expression of opinion in violation of OCGA § 9-10-7. That statute provides that "[i]t is error for any judge, during the progress of any case, or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved." OCGA § 9-10-7. We must view the jury charge as a whole in determining whether the trial judge violated this provision. *City of Columbus v. Barngrover*, 250 Ga. App. 589, 597 (5) (a) (552 SE2d 536) (2001).

We find that the trial court's statements to the jury did not give undue prominence to the contentions of either party and was not vio-

lative of OCGA § 9-10-7. See generally *Latargia v. Toole*, 196 Ga. App. 692 (396 SE2d 607) (1990). Although the judge may have told the jury that they had properly listed all the elements of fraud, there is no evidence that the judge expressed an opinion as to whether those elements had been proved. Further, there is no contention that either the charge or the recharge misstated the law, and the trial court made clear that the recharge was not intended to place added emphasis on the fraud claim. Moreover, it is uncontroverted that in the original charge the trial court instructed the jury that nothing he did or said was intended to suggest in any way what the verdict should be. Accordingly, we find no error.

*Judgment affirmed in part and reversed in part. Ruffin, P. J., and Barnes, J., concur.*

DECIDED MARCH 11, 2003.

*Browning & Tanksley, George T. Smith, Vickie L. Ford,* for appellant.

*James F. Ledbetter,* for appellee.