A11A0283. THOMPSON v. FLOYD.

(713 SE2d 883)

BARNES, Presiding Judge.

Scott Thompson sued George Floyd for breach of contract, promissory estoppel, and fraud, contending that Floyd owed him money for services rendered in connection with the sale of Floyd's business. Floyd denied owing Thompson any money, and after the parties conducted discovery, Floyd moved for summary judgment on all grounds. Following a hearing, the trial court granted the motion, and Thompson appeals. Because genuine issues of material fact exist for a jury to determine in this case, we reverse.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c); *Kaplan v. City of Sandy Springs*, 286 Ga. 559, 560 (1) (690 SE2d 395) (2010). A defendant may establish entitlement to summary judgment either by "presenting evidence negating an essential element of the plaintiff's claims or establishing from the record an absence of evidence to support [those] claims." *Oglethorpe Dev. Group v. Coleman*, 271 Ga. 173, 173 (1) (516 SE2d 531) (1999). If a defendant establishes those requirements, the plaintiff must point to specific evidence giving rise to a triable issue. *Lau's Corp. v. Haskins*, 261 Ga. 491, 491 (405 SE2d 474) (1991). When reviewing the grant or denial of a motion for summary judgment, this court conducts a de novo review, viewing "the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant." (Citation and punctuation omitted.) *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010).

Viewed in the light most favorable to Thompson, and drawing all reasonable inferences from the evidence in his favor, the record

shows that Floyd started Healthlogic Systems Corporation in 1990, and it grew to a peak of 250 employees. The company offered numerous services to health care providers, including the ability to allocate payments to particular accounts receivable. Floyd owned all of the company's stock and had the final say in all company matters. In 2004, a Bank of America consultant discovered that the bank had lost a bid to another entity that was using one of Healthlogic's services, and approached Floyd about establishing a relationship between the bank and Healthlogic. Healthlogic became a vendor for the bank, providing it with some components of the services the bank offered to its health care provider customers. The bank obtained financial information about Healthlogic during its vendor due diligence process, and in 2005 the bank consultant began discussing with Floyd the possibility of the bank buying Healthlogic.

In January 2006, James Basinger, the senior vice president for the bank's global product solutions division, told Floyd that Basinger had received management approval to begin discussing a tentative sales price for Healthlogic, before commencing the full due diligence process. Basinger was the lead contact person for the bank during the ensuing sales process. He asked Floyd to sign a non-disclosure agreement ("NDA"), and after Floyd negotiated changes to the document, he signed and returned it in mid-February 2006. At some point during this time period the bank agreed to buy Healthlogic for $40 million, subject to adjustment based on due diligence findings.

Meanwhile, Floyd and Thompson were discussing the possibility that Thompson would come to work for Floyd and Healthlogic. The two men met in 2005 when Thompson was working for Per-Se Technologies, which had also been interested in buying Healthlogic. Thompson had been working at Per-Se since 1998, and as vice-president of corporate development, by 2005 he had facilitated about a dozen mergers and acquisitions. In January 2006, Per-Se closed on a deal to acquire a large company, M.C. Health. After that acquisition, Per-Se was focused on being acquired by another company, not acquiring more companies itself, and Thompson's position was eliminated at the end of January 2006. In February and March 2006, Thompson began working for the president of Per-Se's hospital division as that division's vice-president of business development.

On February 26, 2006, Thompson sent Floyd an e-mail message offering to help Floyd sell Healthlogic within 12 months "on the best terms possible," pointing out that it was a "long way from an 'Indication of Interest' to closing with a good deal." In exchange for helping Floyd close the deal, Thompson sought payment of $300,000 to $500,000. Floyd responded with the following e-mail message: "1% of sail [sic] price, may add more % for over $30 (tbd) [to be determined]. $1 mm at $50 mm. $10k/mo draw against fee. Deal

must close before 3/31/07." Floyd testified that this e-mail message was an initial offer to pay Thompson one percent of Healthlogic's sales price, and possibly pay him a higher percentage if the price exceeded $30 million, with a draw of $10,000 per month against the final fee, but insisted that the offer did not include the Bank of America acquisition, which was already in process. Instead, it was an offer to pay Thompson a percentage if the Bank of America deal fell through and Thompson found another buyer. Floyd explained he made a "high risk-return" proposal, because Thompson would have been giving up his job at Per-Se, but as Thompson "sat on the sidelines" and did not accept the offer, "the opportunity changed."

Thompson responded to Floyd's February 2006 message in detail, agreeing to accept Floyd's "[s]uccess fee" offer of one percent up to $30 million, with any higher rate at Floyd's discretion, but Thompson wanted $10,000 per month as compensation, not as a draw against the fee. Floyd responded that he would think about it, then on March 1, 2006, Floyd sent Thompson another message with the NDA from Bank of America attached, saying he thought it would be a good idea to "get this done" and was looking forward to "working our deal."

On April 3, 2006, Floyd forwarded to Thompson a message from Basinger, who was the bank's main contact for this acquisition project. Basinger had forwarded to Floyd the bank's contact list for the project, seeking a list of Healthlogic's contacts in return. When Thompson responded by asking if Floyd had gotten his message from the day before, Floyd said he had but was busy and would respond within a few days. Thompson replied later that same day that he was "o.k. with the timeline [Bank of America] put together[.] [W]e should probably decide as soon as possible if you think you want me to participate. I would like to, so just let me know when."

At some point before April 4, 2006, Floyd told Basinger that Thompson was Healthlogic's primary contact person for the day-to-day due diligence work on the acquisition, a role Thompson continued until the deal closed in September 2006. On April 4, 2006, Basinger sent an e-mail message to a large group of people from Healthlogic and the bank, asking them to attend an on-site meeting at the bank's Atlanta office on April 20, 2006, for "the official face-to-face kickoff" of the due diligence process, which would be preceded by "a lot of prep work." In response to the bank's request for information before the meeting, Thompson gathered and compiled data and documents, some of which were incorporated into binders at a "data room" on-site for the bank's representatives to review.

Thompson was the "point person" that Basinger worked with day to day to gather information, and Basinger funneled requests or

questions through Thompson. For example, on April 18, 2006, Thompson and Basinger exchanged messages about the bank's inventory list, Healthlogic's building lease, and Healthlogic's tax returns. On Saturday, April 20, 2006, representatives of Bank of America and Healthlogic held their first in-person due diligence meeting, which Thompson coordinated with all of Healthlogic's department representatives.

Thompson worked on the Healthlogic deal but remained on Per-Se's payroll until Friday, May 19, 2006. On May 22, 2006, Thompson began working for Healthlogic as the CFO. On May 23, 2006, Thompson went to Floyd's home office to discuss specifics about his duties and compensation, and obtain direction as the company's CFO. The following afternoon, Wednesday, May 24, 2006, Thompson e-mailed Floyd a detailed "employment and engagement proposal" based on their discussions the day before. Under the proposal, Thompson's primary job would be "to create and manage the processes whereby multiple prospective buyers will be educated on that company and its opportunities, with the intent of extracting the best overall offer for their purchase of the company." He would also contribute additional services, including coordinating the on-going financial audit, recruiting a company controller, preparing a company forecast tailored to individual prospective buyers, and developing new growth areas for the company. In exchange, he sought a salary of $135,000 annually and incentives based on Healthlogic's final sale price. The incentives included a $50,000 transaction fee when the company sold, a contingent success fee of five percent of any purchase price over $35 million, and half of any working capital payments the bank made to Floyd within ninety days after the closing.

Floyd responded by e-mail later that day, saying, "We are in the ball park." He promised to review the offer with Healthlogic's lawyer, return a response to Thompson "that incorporates our updated contract language," and finish their deal over the weekend. That weekend, on May 28, 2006, Thompson returned to Floyd's home office, intending

> to conclude a variety of conversations we had had over X number of months to document me coming to work for him and helping him achieve a goal. I went there for that purpose. I wanted to eliminate ambiguity for my compensation, my incentive. This was the week after I had left a job for a company I had been with for eight years, I had passed up other job opportunities, walked away from other stock option vesting. And it was done now, I was there, I was committed. I had been working for him since April. This

was the document when I came up there specifically to get George to agree to our points[.]

After two or three hours of discussion, Floyd wrote out terms on the back of an envelope, signed it "George Floyd, CEO," and gave the document to Thompson. The terms, written in an abbreviated style, provide that Thompson would receive a base pay of $11,000 a month, would be reviewed as was standard in the company, and his title would be CFO and Executive Vice President. Under the heading "Deal Participation" was written "$50k < $35MM," "5% for each 1 MM > 35MM," and "Paid out on liquidation event," which meant Floyd agreed to pay Thompson $50,000 if the company sold for less than $35 million, plus five percent of any sales price greater than $35 million, to be paid when the exact amount of the sale was determined, after the bank settled on its figure for Healthlogic's working capital. Floyd "looked me in the eye, he shook my hand, he signed [the envelope]. I felt good about it," Thompson said. Thompson took the envelope and left the house, thinking that he had a commitment from Floyd to the terms written on the envelope.

Thompson continued to work as Healthlogic's main contact person for the Bank of America acquisition. On May 30, 2006, a Healthlogic staff accountant e-mailed Floyd, saying he had been told Thompson would be the CFO and asking Floyd to sign and return a "new hire form." Floyd replied that he would send in the form, and Thompson was placed on Healthlogic's payroll, retroactive to May 22, 2006.

The acquisition closed on September 8, 2006, and Bank of America paid Floyd $40 million in exchange for all of his stock in Healthlogic. Under the purchase agreement, the bank had 90 days to review Healthlogic's finances and then settle on the amount of the company's "working capital," which could have resulted in an adjustment to the sales price. During the 90-day review period after the closing date, the bank did not contest that Healthlogic's working capital was within the range represented at the closing, and thus sought no adjustment to the purchase price. Shortly after the 90-day period passed in December 2006, Thompson sought payment of $300,000 from Floyd, based on their agreement that Floyd would pay Thompson $50,000 plus five percent of the amount by which the sales price exceeded $35 million, which was $250,000. In January 2007, Floyd said he was not going to pay Thompson that much money because the deal did not take very long to close.

Thompson initially sued both Healthlogic and Floyd for breach of contract, promissory estoppel, and fraud, but eventually dismissed the company with prejudice. Floyd moved for summary judgment, arguing that the parties never reached a final agreement and that

even if they had, Thompson's agreement was with Healthlogic, not with Floyd individually. Floyd also argued that Thompson's promissory estoppel claim failed because he was an employee-at-will, and that his fraud claim failed because Floyd had made no false representations.

The trial court held that if an agreement existed, it was between Thompson and Healthlogic, not Floyd personally. Its order granting summary judgment to Floyd on all counts provides:

> [T]his Court finds the purported compensation agreement, if any, was between Plaintiff and Healthlogic Systems Corporation, not George K. Floyd, personally. There is no evidence that Mr. Floyd personally agreed to compensate or employ Plaintiff. Plaintiff went to work for Healthlogic on May 22, 2006 and was compensated by Healthlogic for his work as its Chief Financial Officer and Executive Vice President. Plaintiff's own statements indicate that he expressly understood that his contract was with Healthlogic and not with Mr. Floyd individually.

1. Thompson argues on appeal that the trial court erred in granting summary judgment to Floyd on his breach of contract claim, arguing that questions of material fact exist over whether the parties reached an oral agreement and, if so, whether it was with Floyd personally or with the corporation. Floyd argues that the parties never reached an agreement, but even if they did, the evidence establishes as a matter of law that it was with Floyd in his capacity as CEO and agent for Healthlogic, not with Floyd as an individual.

An agent is personally liable on a contract he enters into with the express or implied understanding of the other party that the agent is binding himself individually. *Wojcik v. Lewis*, 204 Ga. App. 301, 304 (2) (419 SE2d 135) (1992). The other party has no duty to discover that the agent speaks for his principal and not himself; the duty lies with the agent to disclose that he speaks for the principal and he does not intend to be personally liable for the agreement. *Whitlock v. PKW Supply Co.*, 154 Ga. App. 573, 574 (1) (269 SE2d 36) (1980). The fact that the other party is aware of a principal's existence is not by itself enough to relieve the agent of personal liability as an agent of a disclosed principal. Id. "The contract may, depending upon the facts and circumstances, be impliedly one with the agent in his individual capacity. What was the understanding of both parties is a question of fact to be decided by the jury under the circumstances of each case." (Citations and punctuation omitted.) *Chambliss v. Hall*, 113 Ga. App. 96, 99 (2) (147 SE2d 334) (1966).

Under the circumstances present in this case, Floyd's appendage of "CEO" to his signature on the envelope is insufficient to establish as a matter of law that he made an oral agreement as an agent for Healthlogic rather than as an individual, in light of Thompson's conflicting testimony on this point. When asked if he had made his agreement with the company or the individual, Thompson testified that he had made an agreement with Floyd and expected his fee to come from the $40 million that Floyd received, not from Healthlogic, the corporation that became a subsidiary of Bank of America. Along those lines, when asked why his contract was not listed during the due diligence review as an obligation Bank of America would assume, Thompson explained that Bank of America's contract disclosure requirements applied only to contracts that would become Bank of America's obligation to cover services provided after the closing. Thompson had an agreement with Floyd, and payment of his fee after the sale was Floyd's obligation, not Bank of America's.

In contrast, Floyd contends that the envelope document was signed on May 23, 2006, before his e-mail exchanges with Thompson on May 24, 2006. He asserts that those exchanges contained more explicit offers and counter-offers, about which the parties never reached final agreement. When asked if he intended to honor the terms on the envelope he signed, Floyd responded that he did not intend to honor them "in that form," because he considered them simply "a high-level recap of the discussion" that would lead to "a more formal document with appropriate contract terms." He explained that the envelope was "too ambiguous and it was not construed or constructed to be a legally binding contract between us. I threw a signature on there as a gesture of good faith just to get [Thompson] to head on out," and expected him to respond with a proposal incorporating those terms. He further asserted that the terms addressed in the envelope document did not apply to the pending Bank of America deal, only to other potential buyers if the bank deal did not close. He further stated in his deposition that it is impossible to make a verbal commitment to issues of substance, because verbal discussions contain so much ambiguity, and that he did not make commitments of substance that were not in writing.

The parties have very different versions of the facts and of whether Thompson had an agreement, if at all, with Healthlogic or with Floyd the individual. Floyd also argues that Thompson's reading of the contract as binding Floyd personally would render part of the contract nugatory, such as the salary terms that Thompson admits were paid by Healthlogic, not by Floyd. But assuming, as we must, that Thompson's version of events is correct, he has established the existence of genuine issues of material fact as to whether Floyd acted individually or in his capacity as an agent of

Healthlogic. *Wojcik*, 204 Ga. App. at 304; *Whitlock,* 154 Ga. App. at 574; *Chambliss*, 113 Ga. App. at 99. Accordingly, the trial court erred in granting summary judgment to Floyd on this ground.

2. We will consider Floyd's alternative arguments for why summary judgment was proper. Regarding the breach of contract claim, Floyd contends the trial court's grant of summary judgment was proper because any contract between Thompson and Floyd lacked sufficient terms to be enforceable.

Under OCGA § 13-3-1, a valid contract includes three elements: subject matter of the contract, consideration, and mutual assent by all parties to all contract terms. *Lifestyle Family v. Lawyers Title Ins. Corp.*, 256 Ga. App. 305, 309 (1), n. 3 (568 SE2d 171) (2002). A contract need not be in writing to be valid, but "may be enforceable even though it rests only in words as remembered by the witnesses." (Citations and punctuation omitted.) *Cline v. Lee*, 260 Ga. App. 164, 168 (1) (581 SE2d 558) (2003). To determine whether the parties mutually assented to all essential terms of the contract,

> the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement. Where such extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury.

(Citations omitted.) *Turner Broadcasting System v. McDavid*, 303 Ga. App. 593, 598 (1) (693 SE2d 873) (2010). Given the evidence as outlined previously, if we accept Thompson's version of events, he and Floyd agreed to sufficiently specific terms about the subject matter, consideration, and assent to all relevant terms. While a promise to pay an employee "eight to fifteen percent of the stock depending on the sales price of the company," which had not been determined, is too indefinite to be enforceable, *BDI Laguna Holdings v. Marsh*, 301 Ga. App. 656, 664 (3) (689 SE2d 39) (2009), here, Thompson presented sufficient evidence that his agreement with Floyd was for a definite amount of consideration. Further, contrary to Floyd's argument, Thompson does not contend he had an employment agreement, but that he had an agreement with Floyd to be paid a percentage of the company's sales price.

Thompson presented evidence that could allow a jury to find the contract's subject matter was established, the parties' consideration was definite, and the parties' mutual assent to all terms was complete. While the parties dispute the value of Thompson's contribution to the successful closing — Floyd described it as "Mickey Mouse work" that involved "shuffling documents" in a manner that

hundreds of people could have done, and Thompson described it as high-level negotiations and analysis crucial to handling issues that could have ended the deal altogether — these differences simply highlight that factual issues exist for a jury to determine. Therefore, Floyd was not entitled to summary judgment on Thompson's breach of contract claim based on this alternative ground.

3. Additionally, the trial court erred in granting summary judgment on Thompson's promissory estoppel claim. "[T]he objection of indefiniteness may be obviated by performance and acceptance of performance." (Citation and punctuation omitted.) *Pine Valley Apts. L.P. v. First State Bank*, 143 Ga. App. 242, 245 (237 SE2d 716) (1977).

Further,

> even if the contract in this case could be considered too indefinite to enforce, a party may enter into a contract invalid and unenforceable, and by reason of the covenants therein contained and promises made in connection with the same, wrongfully cause the opposite party to forego a valuable legal right to his detriment, and in this manner by his conduct waive the right to repudiate the contract and become estopped to deny the opposite party any benefits that may accrue to him under the terms of the agreement.

(Citations and punctuation omitted.) *Reebaa Constr. Co. v. Chong*, 283 Ga. 222, 224 (2) (657 SE2d 826) (2008).

The elements of the equitable doctrine of promissory estoppel are that the defendant made a promise upon which he reasonably should have expected the plaintiff to rely, the plaintiff relied on the promise to his detriment, and injustice can be avoided only by enforcing the promise because the plaintiff forwent a valuable right. *Pabien Outdoor-Aiken, Inc. v. Dockery*, 253 Ga. App. 729, 730-731 (560 SE2d 280) (2002). Thompson testified that in exchange for Floyd's promise to pay a fee upon the completion of Healthlogic's sale, Thompson left his former employer of eight years and gave up his right to future stock options that would have vested when his former employer was sold to another company six months after Thompson left. He also testified that he passed up other employment opportunities to his detriment. If a jury were to find Thompson's version of events more credible than Floyd's, then the jury would be authorized to find that an injustice could only be avoided by enforcing Floyd's promise. See *20/20 Vision Center v. Hudgens*, 256 Ga. 129, 135 (7) (345 SE2d 330) (1986); *Sun-Pacific Enterprises v. Girardot*, 251 Ga. App. 101, 106 (553 SE2d 638) (2001) ("Promissory estoppel is an equitable doctrine designed to prevent the intricacies

and details of the law from frustrating the ends of justice." (Punctuation and footnote omitted.).

Contrary to Floyd's arguments, Thompson's promissory estoppel claim is not precluded by the principles elucidated by *Balmer v. Elan Corp.*, 278 Ga. 227 (599 SE2d 158) (2004). *Balmer* reasserts the principle that a promise of employment for an indefinite term is insufficient to support a cause of action based on either breach of contract or promissory estoppel. Id. at 230 (4); see also *Barker v. CTC Sales Corp.*, 199 Ga. App. 742, 743 (1) (406 SE2d 88) (1991). Thompson is not bringing a claim based on a breached promise of employment for an indefinite term. His claim is based on Floyd's alleged promise to pay Thompson for successfully closing the sale of Healthlogic to Bank of America. Thompson presented evidence that he relied on the promise and performed the work, and that Floyd closed the sale, and now Thompson seeks payment based on the promise. We therefore reverse the trial court's grant of summary judgment to Floyd on Thompson's promissory estoppel claim.

4. Finally, the trial court erred in granting summary judgment to Floyd on Thompson's fraud claim.

> The tort of fraud has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff. For an action for fraud to survive a motion for summary judgment, there must be some evidence from which a jury could find each element of the tort.

(Citations omitted.) *Crawford v. Williams*, 258 Ga. 806 (375 SE2d 223) (1989). "Given that fraud is inherently subtle, slight circumstances of fraud may be sufficient to establish a proper case. . . . Moreover, it is peculiarly the province of the jury to pass on these circumstances showing fraud." (Citations omitted.) *Almond v. McCranie*, 283 Ga. App. 887, 889 (2) (643 SE2d 535) (2007).

In light of the evidence as outlined previously, we conclude that Thompson presented sufficient evidence on each element of fraud to survive a motion for summary judgment. Accordingly, we reverse the trial court's grant of summary judgment on this claim to Floyd.

*Judgment reversed. Adams and Blackwell, JJ., concur.*

DECIDED JULY 8, 2011.

*Bondurant, Mixson & Elmore, Jason J. Carter*, for appellant.

*Mahaffey, Pickens & Tucker, Steven A. Pickens, Andrew D. Stancil, Franzen & Salzano, Therese G. Franzen*, for appellee.