A04A2186. MARSHALL v. KING & MORGENSTERN et al.
A04A2187. FIRST AMERICAN TITLE INSURANCE COMPANY
v. MARSHALL.
(613 SE2d 7)

RUFFIN, Chief Judge.

After purchasing a home in August 1999, David Marshall discovered a significant title problem relating to his property. He subsequently sued Charles King, the attorney who conducted the real estate closing, King's law firm, and First American Title Insurance Company ("First American") for, among other things, breach of contract, fraud, and "equitable estoppel." King and his law firm (collectively, "the King defendants") and First American moved for summary judgment. Following a hearing, the trial court granted summary judgment to the King defendants, but denied First American's motion.

In Case No. A04A2186, Marshall appeals the trial court's grant of summary judgment to the King defendants. In Case No. A04A2187, First American appeals the denial of its summary judgment motion. For reasons that follow, we affirm in part and reverse in part both judgments.[1]

Summary judgment is appropriate when no genuine issues of material fact remain and the movant is entitled to judgment as a matter of law.[2] We review a trial court's summary judgment ruling de novo, construing the facts and all reasonable inferences in favor of the nonmoving party.[3]

Viewed in this manner, the record shows that Marshall closed on his property on August 31, 1999. During the closing, King asked Marshall to sign a form entitled "Survey Waiver and Acknowledgment with Hold Harmless." The waiver stated that Premier Lending, the mortgage company providing financing to Marshall, was not required to perform a survey on the property. It further stated that, although Marshall could obtain a survey for a fee, he had elected not to have one prepared. The waiver also contained an acknowledgment that any title insurance Marshall might obtain to protect his interest in the property "may be affected by [his] decision to decline preparation and purchase of said survey." And it provided that Marshall

> indemnif[ies] and hold[s] Premier Lending Corporation harmless from any and all costs, damage and expenses in any way from the existence of any matters that would be disclosed by any such survey including but not limited to . . . encroachments, easements, limitations and/or conditions, and do[es] hereby release Premier Lending Corporation from any and all liability arising in any manner therefrom.

Before signing the waiver, Marshall asked King and a Premier representative who attended the closing whether he needed to obtain a survey in order to close on the property. Both responded "no." Marshall then asked King how he could protect his interest in the property. King replied that Marshall could purchase a title insurance policy, and he offered to sell Marshall a policy.

After Marshall indicated that he wished to purchase the insurance and signed the waiver form, King stated that he would "take care

---

[1] On October 26, 2004, Marshall moved for reconsideration of our order denying his requested extension of time to file a reply brief in Case No. A04A2186. Although we initially denied Marshall's motion, we have, in our discretion, considered his late-filed reply brief in resolving this appeal.

[2] See *Ades v. Werther*, 256 Ga. App. 8 (567 SE2d 340) (2002).

[3] See id.

of" the insurance. The record shows that King had an agency agreement with First American that authorized him to issue First American title insurance policies, as well as commitments for policies. Under the agreement, First American appointed King "to act for, and in the name of, [First American] in transacting [such] title insurance business."

King testified that, at the time of Marshall's closing, he was authorized to issue two types of First American title insurance policies to property owners: a "standard owner's policy" and a more expensive and expansive "Eagle" policy. King did not describe the differences between these policies to Marshall. Instead, he simply charged Marshall for the standard policy, and King's office mailed the policy to Marshall on January 21, 2000, along with the property's warranty deed.

At some point during the fall of 1999, Marshall heard a rumor that a portion of his house was located on an adjoining lot belonging to his neighbor, William Clerkin. Clerkin eventually informed Marshall that the property line between their lots ran through Marshall's house. A subsequent survey revealed that a significant percentage of Marshall's home encroached upon Clerkin's property.

Shortly after receiving his title insurance policy in January 2000, Marshall informed First American of the problem relating to his property and asked that it be resolved. The standard title policy, however, expressly excludes loss or damage relating to "[e]ncroachments, overlaps, boundary line disputes, or other matters which a correct survey would disclose." In a March 15, 2000 letter, Chris Haston, counsel for First American, cited this provision to Marshall, but stated that he nevertheless was "working in an effort to try to resolve the dispute." To facilitate this effort, Haston asked Marshall to avoid speaking with Clerkin. As requested, Marshall did not discuss the situation with Clerkin or try to settle it himself.

On May 2, 2000, First American purchased from Clerkin that portion of his property encroached upon by Marshall's home. A First American attorney informed Marshall of this purchase in an August 3, 2000 letter, which stated:

> As you may be aware by now, [First American] has settled Premier Lending's potential title claim based on their Lender's Title Policy on your property. The settlement consisted of Mr. and Mrs. Clerkin conveying the portion of their lot . . . on which your house and septic system lies [sic] to [First American], in consideration of payment in the amount of $15,000.00 from First American to them.

First American currently holds title to this property.

Marshall later sued the King defendants and First American, alleging various claims. As to the King defendants, Marshall alleged that they breached a contract by failing to provide him with title insurance that would protect against title problems, regardless of whether he obtained a survey. He also alleged claims against the King defendants for "equitable estoppel" and attorney fees. With respect to First American, Marshall alleged claims for fraud, breach of contract, equitable estoppel, punitive damages, and attorney fees. Following a hearing, the trial court granted summary judgment to the King defendants, but denied First American's motion for summary judgment.

### Case No. A04A2186

In this appeal, Marshall challenges the trial court's ruling on the King defendants' motion for summary judgment.

1. According to Marshall, questions of fact remain as to whether the King defendants — through their agent, King — entered into an oral agreement to sell Marshall a title policy that would insure against title problems, notwithstanding the lack of a survey. We agree.

"Where there is a conflict in the evidence as to the existence of an oral contract or as to its terms, the matter must be submitted to a jury for resolution."[4] In this case, the record shows that King was authorized to issue two types of title insurance policies at the time of the Marshall closing: the standard policy and an expanded Eagle policy. The standard policy actually issued to Marshall excepted from coverage damage or loss relating to encroachments or title problems that would have been revealed by a survey. According to First American's general counsel for Georgia, however, the Eagle policy would have provided Marshall with coverage for this dispute, despite his failure to obtain a survey.

At the August 31, 1999 closing, Marshall asked King whether he needed to obtain a property survey to close. When King responded "no," Marshall asked how he could protect his interest in the land, and King told him to buy title insurance. King offered to sell him such insurance, and Marshall agreed to purchase it. Given these circumstances, we find that a question of fact remains as to whether King orally agreed to sell Marshall a title insurance policy that would protect Marshall's interest in the property, despite his decision to forgo a survey. Although King did not describe the various policies to Marshall at the closing, a jury could conclude that King offered to sell,

---

[4] (Punctuation omitted.) Id. at 10 (1).

and Marshall agreed to purchase, First American's expanded title policy that did not except from coverage problems that would have been disclosed through a survey.[5] In other words, a factual question remains as to whether King committed to issuing an Eagle policy, but simply failed to do so in breach of an oral agreement.

On appeal, the King defendants argue that Marshall is attempting to improperly vary the terms of his written title insurance policy.[6] We disagree. This case involves two alleged agreements: (1) an oral agreement to sell Marshall the type of title policy that would have protected him in this dispute, notwithstanding the lack of a survey, and (2) the actual contract of insurance issued by First American. Marshall is not trying to expand the second agreement. Instead, he has alleged that the King defendants, through King, breached the first agreement.

Moreover, Marshall was not provided with a copy of his insurance policy to review until January 2000, after the title issue arose. And First American's general counsel admitted that a closing attorney typically does not issue a title policy to a home buyer on the day of closing. Thus, this does not appear to be a situation in which Marshall could have examined his policy and, upon finding that it was not what he intended to purchase, renegotiated its terms.[7]

At points in their appellate brief, the King defendants rely on the Premier Lending survey waiver as a basis for summary judgment. They argue, for example, that Marshall acknowledged in the waiver that his failure to obtain a survey could affect coverage under his title insurance policy. But Marshall contends that he sought, and King agreed to provide, a title insurance policy that *would* protect his property interest, despite his decision not to have the property surveyed. We fail to see, therefore, how this acknowledgment supports summary judgment. Similarly, Marshall's agreement to hold Premier Lending harmless for certain losses does not entitle the *King defendants* to summary judgment on the breach of contract claim.

---

[5] See id.; *Spoon v. Herndon*, 167 Ga. App. 794, 795 (1) (307 SE2d 693) (1983).

[6] See *Elrod's Custom Drapery Workshop v. Cincinnati Ins. Co.*, 187 Ga. App. 670, 670-671 (371 SE2d 144) (1988) ("Where an insurance policy is unambiguous, parol evidence as to what was said by parties at the time application for the policy was taken is inadmissible to vary or alter the terms of the policy.") (punctuation omitted) (physical precedent only).

[7] Compare *Sapp v. State Farm Fire &c. Co.*, 226 Ga. App. 200, 206-207 (d) (486 SE2d 71) (1997) (" 'The insured was not only free to examine the contract, he was under a duty to do so, and if he had done that he would have observed just what coverage it provided to him. If it was not what he wished to have he could have renegotiated his contract, or, if the company was unwilling to do that, he could have returned it as unacceptable and negotiated a contract with another company.' ").

2. Although not completely clear from the complaint, it appears that Marshall has also attempted to state a claim against the King defendants for an independent cause of action based upon "equitable estoppel." Under Georgia law, however, "[e]stoppel is not a cause of action."[8] Absent a proper legal claim, a plaintiff cannot recover simply by establishing the elements of equitable estoppel.[9] Accordingly, to the extent the trial court granted the King defendants summary judgment on Marshall's stand-alone equitable estoppel claim, we affirm.

3. Marshall also alleged a claim for attorney fees, asserting that the King defendants have been stubbornly litigious, have acted in bad faith, and/or have caused him unnecessary trouble and expense. On appeal, however, he does not address the attorney fee claim or present any argument as to how the trial court erred in granting summary judgment. To the extent he challenges the trial court's summary judgment ruling as to this claim, therefore, we deem his challenge abandoned.[10]

4. Finally, Marshall argues that the trial court erred in failing to strike the affidavit of Charles King. He contends that the affidavit lacks probative value and should not have been considered in the summary judgment proceedings. Given our decision in Division 1, we find this enumeration of error moot. Furthermore, to the extent it is not moot, we note that the trial court specifically stated in its summary judgment order that it had not relied on any portion of the King affidavit that Marshall sought to strike. Thus, even if the trial court erred in failing to strike the affidavit, Marshall cannot show that the error harmed him.[11]

## Case No. A04A2187

In this appeal, First American challenges the trial court's denial of its motion for summary judgment.

5. In his complaint, Marshall alleged that First American defrauded him by: "(a) falsely representing . . . that it was trying to resolve his encroachment problem; (b) advising him not to talk to the Clerkins; (c) clandestinely purchasing [a] portion of the [Clerkins' property]; and (d) waiting three months before notifying him of [this]

---

[8] (Punctuation omitted.) *Kirkland v. Pioneer Machinery*, 243 Ga. App. 694, 696 (534 SE2d 435) (2000).

[9] See id.

[10] See Court of Appeals Rule 25 (c) (2).

[11] See *Lloyd v. Hardman*, 261 Ga. App. 894 (2) (583 SE2d 925) (2003) (to obtain reversal, appellant must show that error was harmful).

purchase." The crux of Marshall's fraud claim involves Chris Haston's March 15, 2000 letter, in which Haston informed Marshall that he was "working in an effort to try to resolve the dispute," despite Marshall's failure to obtain a survey. According to Marshall, this statement fraudulently led him to believe that First American was trying to "work out a deal" with the Clerkins to solve his encroachment problem, when it was actually seeking to protect itself against a claim from Premier Lending.

The tort of fraud has five elements: (1) a false representation; (2) scienter; (3) an intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance by the party claiming fraud; and (5) damages.[12] In this case, we find no evidence of a false representation. The March 15, 2000 letter stated merely that First American was trying to resolve the title dispute. And, in fact, First American took care of some part of the dispute between Marshall and Clerkin. Marshall admitted that Clerkin had threatened to begin eviction proceedings against him based on the encroachment. By purchasing the encroached-upon land from Clerkin, First American removed that particular threat.

Marshall clearly is not happy with the resolution reached by First American and notes that First American now owns the land on which a portion of his house sits. In the March 15, 2000 letter, however, Haston stated only that he would try to resolve the dispute and asked Marshall to refrain from speaking with Clerkin. Haston made no representations regarding what the resolution ultimately would be, and he never indicated that a resolution could be reached. Moreover, First American actually resolved one issue involved in the dispute — Clerkin's threat to evict Marshall. Simply put, Marshall has not shown that any statement in the March 15, 2000 letter constituted a false representation. Accordingly, First American is entitled to summary judgment on Marshall's fraud claim.[13]

6. For the reasons discussed in Division 2, First American is also entitled to summary judgment on Marshall's "claim" for equitable estoppel.

7. The trial court properly denied First American summary judgment on Marshall's breach of contract claim. This claim involves the same conduct at issue in Marshall's contract allegations against the King defendants. According to the complaint, First American is liable to Marshall under an agency theory for the King defendants' breach of the alleged oral contract to issue a title policy that would have protected him against the title problem.

---

[12] See *Revis v. Jowers*, 264 Ga. App. 13, 15 (1) (589 SE2d 657) (2003).
[13] See id.

First American argues that no enforceable oral agreement ever arose. As found in Division 1, however, questions of fact remain regarding the breach of contract claim against the King defendants. And First American does not challenge Marshall's agency theory on appeal. Thus, First American is not entitled to summary judgment on the breach of contract claim.

8. The trial court erred, however, to the extent it denied First American summary judgment as to Marshall's claims for punitive damages and attorney fees. " 'It is well settled that punitive damages are not available in breach of contract claims.' "[14] Because the only substantive claim remaining against First American sounds in contract, First American is entitled to summary judgment on Marshall's prayer for punitive damages.[15]

Marshall's claim for attorney fees also fails as a matter of law. Under OCGA § 13-6-11, a plaintiff may recover litigation expenses, including attorney fees, from a defendant who has been stubbornly litigious, has caused the plaintiff unnecessary trouble and expense, or has acted in bad faith.[16] Marshall claims that all three grounds justify an attorney fee award against First American.

We disagree. When a bona fide controversy exists between the parties, a plaintiff cannot cite stubborn litigiousness or unnecessary trouble and expense as proper grounds for awarding attorney fees.[17] And, given the evidence in this case, a bona fide controversy remains as to whether First American, through its agents, entered into an oral agreement with Marshall at the August 31, 1999 closing to provide title protection, despite Marshall's decision not to obtain a survey.[18]

To support an attorney fee award, therefore, Marshall must show that First American acted in bad faith.[19] The bad faith contemplated by OCGA § 13-6-11, however, "is bad faith connected with the transaction and dealings out of which the cause of action arose, rather than bad faith in defending or resisting the claim after the cause of action has already arisen."[20] The cause of action at issue here is the breach of contract claim. And Marshall has presented no evidence that First American made the alleged oral contract in bad faith or breached it

---

[14] *Cline v. Lee*, 260 Ga. App. 164, 169-170 (2) (581 SE2d 558) (2003).

[15] See id.

[16] See *Grange Mut. Cas. Co. v. Kay*, 264 Ga. App. 139, 144 (5) (589 SE2d 711) (2003).

[17] See id.

[18] See id.

[19] See id.

[20] (Punctuation omitted.) *Smith v. Stuckey*, 233 Ga. App. 103, 107 (3) (503 SE2d 284) (1998).

" 'as a result of some sinister motive.' "[21]

We recognize that, on appeal, Marshall claims that First American and the King defendants decided to breach the alleged oral promise and issue a standard policy — as opposed to an Eagle policy — several months after closing, following discovery of the title dispute. The record, however, belies this claim. At closing, King charged Marshall for the less expensive "standard" title policy. We must conclude, therefore, that King sold Marshall a standard policy on August 31, 1999, and any breach of the alleged oral contract occurred at that point.

Marshall has shown no " 'ill will or furtive design [by First American] with regard to the performance of the contract.' "[22] Accordingly, the trial court erred in denying First American summary judgment on the attorney fee claim.

*Judgments affirmed in part and reversed in part. Adams and Bernes, JJ., concur.*

DECIDED FEBRUARY 21, 2005 —
RECONSIDERATIONS DENIED MARCH 29, 2005 — 

*Gary C. Harris*, for Marshall.

*Swift, Currie, McGhee & Hiers, James T. McDonald, Jr., Michael Carestia*, for King & Morgenstern et al.

*Beloin & Associates, Frederic S. Beloin*, for First American Title Insurance Company.

---

[21] *Williams Tile & Marble Co. v. Ra-Lin & Assoc.*, 206 Ga. App. 750, 752 (5) (426 SE2d 598) (1992).

