**FIRST DIVISION**
**BROWN, C. J.,**
**BARNES, P. J., and WATKINS, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**July 2, 2025**

# In the Court of Appeals of Georgia

A25A0145. TUSCANY CONDOMINIUM ASSOCIATION, INC.
    et al. v. C.P.

WATKINS, Judge.

Tuscany Condominium Association, Inc. ("TCA"), a defendant in the case below, brings this interlocutory appeal from the trial court's orders denying its motion for summary judgment on the plaintiff's claims for negligent security and attorney fees, denying its motion to dismiss all other claims, and denying its motion for a mental examination of the plaintiff, C. P. For the following reasons, we affirm the trial court's rulings.

"Summary judgment is appropriate when no genuine issues of material fact remain and the movant is entitled to judgment as a matter of law. We review a trial

court's summary judgment ruling de novo, construing the facts and all reasonable inferences in favor of the nonmoving party."[1]

So viewed, the record shows that TCA is the nonprofit representative body of Tuscany Condominiums. Its membership is comprised of each unit owner, and it is governed by a board of directors. TCA's "Declaration of Condominium" and Bylaws were filed and recorded in Fulton County Deed Book 28776, pages 192 to 263, and the Condominium was submitted to the Georgia Condominium Act, OCGA § § 44-3-70 et seq. ("the Condo Act"). Thus, TCA is also governed by the Condo Act.[2]

Under the terms of the Declaration, TCA has the obligation to maintain "common elements,"[3] which the Declaration defines as "all portions of the Condominium not located within the boundaries of a Unit."[4] TCA also has the "right and authority . . . to control, manage, operate, maintain, improve and replace all

---

[1] (Citation omitted.) *Marshall v. King & Morgenstern*, 272 Ga. App. 515, 516 (613 SE2d 7) (2005).

[2] See OCGA § 44-3-113 (a).

[3] See Declaration, ¶ 17 ("MAINTENANCE RESPONSIBILITY").

[4] See Declaration, ¶ 5 ("COMMON ELEMENTS").

portions of the Area of Common Responsibility[.]"[5] As to the leasing of individual units, the Declaration provides that unit owners may lease their units if they obtain permission from TCA and if TCA approves the form of the lease.[6]

Of particular importance to this appeal, Paragraph 19 (a) of the Declaration includes the following "no security" provision:

> *SECURITY*. THE ASSOCIATION OR THE DECLARANT MAY, BUT SHALL NOT BE REQUIRED TO, FROM TIME TO TIME, PROVIDE MEASURES OR TAKE ACTIONS WHICH DIRECTLY OR INDIRECTLY IMPROVE SAFETY ON THE CONDOMINIUM; HOWEVER, EACH OWNER, FOR HIMSELF OR HERSELF AND HIS OR HER TENANTS, GUESTS, LICENSEES, AND INVITEES, ACKNOWLEDGES AND AGREES THAT NEITHER THE ASSOCIATION NOR THE DECLARANT IS A PROVIDER OF SECURITY AND NEITHER PARTY SHALL HAVE A DUTY TO PROVIDE SECURITY ON THE CONDOMINIUM. FURTHERMORE, THE ASSOCIATION DOES NOT GUARANTEE THAT NON-UNIT OWNERS AND NON-OCCUPANTS WILL NOT GAIN ACCESS TO THE PROPERTY AND COMMIT CRIMINAL ACTS ON THE PROPERTY NOR DOES THE ASSOCIATION GUARANTEE THAT CRIMINAL ACTS ON THE PROPERTY WILL NOT BE COMMITTED BY OTHER UNIT OWNERS OR OCCUPANTS. IT SHALL BE THE RESPONSIBILITY OF EACH OWNER TO PROTECT HIS OR HER

---

[5] See Declaration, ¶ 9 ("ASSOCIATION RIGHTS AND RESTRICTIONS . . . . [t]he Association shall maintain and keep in good repair as a Common Expense the 'Area of Common Responsibility,' which includes . . . all Common Elements."

[6] See Declaration, ¶ 15 ("LEASING").

PERSON AND PROPERTY AND ALL RESPONSIBILITY TO PROVIDE SUCH SECURITY SHALL LIE SOLELY WITH EACH UNIT OWNER. NEITHER DECLARANT NOR THE ASSOCIATION SHALL BE HELD LIABLE FOR ANY LOSS OR DAMAGE BY REASON OF FAILURE TO PROVIDE ADEQUATE SECURITY OR INEFFECTIVENESS OF SAFETY MEASURES UNDERTAKEN.

Umar Sayed owned a unit at Tuscany Condominiums, and he entered into a Residential Rental Agreement (the "Lease") with C. P. to rent his unit from March 1, 2020, until February 28, 2021. The Lease provided in pertinent part:

RULES AND REGULATIONS. . . . House Rules: Resident agrees to abide by any and all protective covenants, by-laws or other regulations as set forth by the subdivision or condominium association of the community. Resident further agrees that any violation of said covenants, by-laws, or regulations by Resident will constitute a breach of this agreement and Resident will be responsible for any fine imposed by the community as a result of Resident's violation.

USE: Property shall be used for residential purposes only and shall be occupied only by the persons named in Resident's application to lease. Property shall be used so as to comply with all state, county and municipal laws and ordinances. Resident shall not use property or permit it to be used for any disorderly or unlawful purpose or in any manner so as to interfere with other resident's quiet enjoyment of the property. Resident agrees to abide by any condominium or neighborhood association covenants, conditions and rules and regulations that may be in effect for the property.

In addition, the Lease included the following provision:

4

SECURITY OF PROPERTY. Resident acknowledges that Management [(defined elsewhere in the lease as Sayed)] has not made any representations, written or oral, concerning the safety of the community or the property or the effectiveness or operability of any security devices. Residents acknowledge that Management does not warrant or guarantee the safety or security of Residents or their guests or invitees against the criminal or wrongful acts of third parties. Each resident, guest, or invitee is responsible for protecting his or her own person and property.

On June 7, 2020, an assailant entered the premises through an unlocked pedestrian gate, pulled C. P. into a vacant unit, and raped her. C. P. filed a lawsuit against TCA, Community Management Associates, Inc. (the community's manager), and Dunwell Services, LLC (which provided security services for the complex), alleging, generally, that the defendants' combined negligence caused the incident. Specifically, C. P. asserted claims for (1) negligent security, (2) negligence per se, (3) negligent hiring, training, supervision, and retention, (4) negligent entrustment, (5) negligent misrepresentation, and (6) nuisance. C. P. also asserted claims for punitive damages as well as attorney fees and litigation expenses under OCGA § 13-6-11.

TCA subsequently filed the three motions at issue in this appeal. The trial court heard oral argument on the motions, then issued orders denying each of them. We granted TCA's application for interlocutory review, and this appeal ensued.[7]

1. TCA argues that the trial court erred in denying its motion for summary judgment on C. P.'s premises liability/negligent security claim and on her claim for attorney fees under OCGA § 13-6-11. We will address each claim in turn.

*(a) Negligent Security*

First, TCA argues that the Declaration's "no security" provision bars C. P. from proceeding on her premises liability/negligent security claim. We disagree.

Under OCGA § 51-3-1, property owners and occupiers must exercise ordinary care to keep their premises safe for invitees. In light of this rule, a condominium association generally "ha[s] a duty to exercise ordinary care to protect [invitees] from unreasonable risks of which it ha[s] superior knowledge."[8] "With regard to potential criminal attacks by third parties, the landowner is not the insurer of the invitee's

---

[7] In addition to briefs from the appellant and the appellee, the Court has received an amicus brief from Community Associations Institute and an "other party" brief from Community Management Associates, Inc. See Court of Appeals Rules 23 (d), 26.

[8] *Sacker v. Perry Realty Svcs., Inc.*, 217 Ga. App. 300, 301 (457 SE2d 208) (1995).

6

safety, but nonetheless is required to exercise ordinary care to protect the invitee from unreasonable risks of which he or she has superior knowledge."[9]

In *Bradford Square Condominium Association v. Miller*, this Court held that a condominium association and its unit owners may choose to depart from this general rule with respect to the association's duty to owners to provide security for the property.[10] That is, members of a condominium association can elect to relieve the association of the duty to provide security and opt for such obligation to remain with each individual unit owner. In *Bradford Square*, we held that such an agreement was enforceable and was not against public policy.[11]

The "no security" provision in TCA's Declaration is similar to the provision in *Bradford Square*. The question presented in this case, however, is not whether such

---

[9] (Citation and punctuation omitted.) *Martin v. Six Flags Over Georgia II, L.P.*, 301 Ga. 323, 328 (II) (801 SE2d 24) (2017).

[10] 258 Ga. App. 240, 243-248 (1) (a) (573 SE2d 405) (2002).

[11] Id. at 246-248 (1) (a) (holding that a condominium association did not owe a duty to its members under OCGA § 51-3-1 to provide security for the common areas of the premises against third-party criminal acts where there was an express "no security" provision in the condominium association's governing documents); see also *Sadlowski v. Beacon Mgmt. Svcs., Inc.*, 348 Ga. App. 585, 590-94 (1) (824 SE2d 42) (2019) (noting that a condominium association did not owe a legal duty to a homeowner based on an explicit "no security" provision in the governing documents).

a "no security" provision can be applied to unit owners, but whether it can be applied to renters — who are, unlike unit owners, not members of the association. This is an issue of first impression.[12]

In denying TCA's motion for summary judgment, the trial court treated the "no security" provision as an exculpatory clause and concluded that it is not enforceable against C. P. because "C.P.'s lease lacks an explicit, prominent, clear, and unambiguous exculpatory clause for security that covers Tuscany[.]" The trial court further concluded that although the provision was prominent in the Declaration, that "does not bind C.P. absent some evidence that it [the Declaration] was provided to or reviewed by her or that her attention was similarly drawn to the Declaration's existence." We agree with the trial court's analysis and conclusion.

Georgia law imposes strict requirements for an exculpatory clause to be valid.

> Exculpatory clauses must be clear and unambiguous, they must be specific in what they purport to cover, and any ambiguity will be construed against the drafter of the instrument. The reason why

---

[12] See *Bradford Square*, 258 Ga. App. at 249 (on motion for reconsideration, noting that our decision was based on "the unique interrelationship between a condominium association and the unit owners/members that are, in fact, the association[,]" and emphasizing that "[w]e were not asked to decide in this case a condominium association's duty toward *non*members/owners pursuant to OCGA § 51-3-1[ ]") (emphasis in original).

exculpatory clauses should be explicit, prominent, clear and unambiguous, is that such an agreement amounts to a waiver of substantial rights, could be an accord and satisfaction of possible future claims, and requires a meeting of the minds on the subject matter.[13]

Here, the Lease between Sayed and C. P. did not include any explicit, prominent, and unambiguous statement reflecting the Declaration's "no security" provision. As outlined above, the Lease referred to the community's "Rules and Regulations" (and provided that C. P. was required the follow the community's rules and would be responsible for any fine imposed by the community if she violated them), and to "Security of Property" (and provided that "Management," which the lease defined to be Sayed, did not guarantee C. P.'s safety against wrongful acts of third parties), but no portion of the Lease specifically mentioned the Declaration's "no security" provision, and C. P. was not provided a copy of the Declaration.

TCA argues that the Declaration's "no security" provision nonetheless applies to C. P. because she agreed in her Lease to be bound by the Declaration and because of the Condo Act, which provides that "all those entitled to occupy a unit shall

---

[13] (Citation and punctuation omitted.) *Dept. of Transp. v. Arapaho Constr., Inc.*, 180 Ga. App. 341, 343 (1) (349 SE2d 196) (1986).

comply with all lawful provisions of the condominium instruments."[14] These arguments ignore the well-established requirement that an exculpatory clause must be "explicit, prominent, clear and unambiguous" to be enforceable.[15] Again, while the "no security" provision may have been a prominent and unambiguous part of the Declaration, it was never mentioned in the Lease between Sayed and C. P., and the Declaration itself was not provided to C. P. Although the recording of a Declaration constitutes constructive notice to *purchasers* of the property,[16] we decline to hold that such notice, alone, is sufficient to enforce an exculpatory clause contained within that document against individuals who are not owners of the subject property. Simply put, the "no security" provision is not enforceable as to C. P. because it was not explicit, prominent, clear, and unambiguous as to C. P.[17]

---

[14] OCGA § 44-3-76.

[15] See *Arapaho Constr.*, 180 Ga. App. at 343 (1). To the extent TCA argues that we should overrule such precedent or deem it to be inapplicable to the instant case, we decline to do so.

[16] See *Wyndham Lakes Homeowners Assn., Inc. v. Gray*, 303 Ga. App. 45, 47-48 (1) (692 SE2d 704) (2010).

[17] Cf. *Thornton v. Uber Technologies, Inc.*, 359 Ga. App. 790, 794-795 (1) (b) (858 SE2d 255) (2021) (where smartphone application provided that by creating an account, users agreed to be subject to the application's terms and conditions, but it was not clear whether the application's hyperlink to those terms and conditions was visible to the decedent during

TCA further argues that because Sayed did not have the right to sue TCA for negligent security, he could not convey that right to C. P. This argument is unavailing because C. P. is not relying on Sayed's rights to seek relief from TCA. Instead, her claims are based on her own status as an invitee.

Finally, TCA argues that it would be "absurd" for TCA to be required to provide security for renters but not for owners.[18] But as TCA acknowledges, our holding in *Bradford Square* — that members of an association can vote for the association to disclaim liability under OCGA § 51-3-1 to provide security in common areas with respect to claims by owners — was expressly based on "the unique interrelationship between a condominium association and the unit owners/members

---

the account-creation process, trial court erred by deciding as a matter of law that the decedent assented to the terms and conditions when he created his account).

[18] As mentioned above, the Declaration provides that unit owners may lease their units if TCA approves the form of the lease. See Declaration, ¶ 15 ("LEASING"). TCA could choose to approve only leases that clearly and unambiguously incorporate the "no security" provision of the Declaration. But see *First Communities Mgmt. v. Byrd*, 373 Ga. App. 361, 369-372 (1) (b) (908 SE2d 376) (2024) (physical precedent only ) (noting that "OCGA § 13-8-2 (b) prohibits certain exculpatory clauses in leases[,]" and holding that the exculpatory clause at issue — which purported to relieve an apartment owner and management from liability to a resident for "any liability, injury, loss, or damages related to crimes committed by other persons against Resident" — was invalid because it "include[d] a waiver even for [the owner's] sole negligence, which is prohibited by OCGA § 13-8-2 (b)[ ]"), cert. denied (Feb. 18, 2025).

that are, in fact, the association[.]"[19] C. P. does not share the same interrelationship with the association, so it makes sense for her relationship with the association to be treated differently. And as outlined above, TCA has a duty, under OCGA § 51-3-1, to exercise ordinary care in preventing unreasonable risks related to the physical maintenance of the common elements.[20]

For all of these reasons, we reject TCA's attempt to enforce the Declaration's "no security" provision against C. P. and affirm the trial court's denial of TCA's motion for summary judgment.

### (b) Attorney Fees and Expenses

TCA argues that pursuant to recent amendments to the Georgia Code, awards under OCGA § 13-6-11 are available only in contract cases, not tort cases like the instant proceeding.

OCGA § 13-6-11 provides:

The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been

---

[19] *Bradford Square*, 258 Ga. App. at 245 (1) (a).

[20] See *Sacker*, 217 Ga. App. at 301.

> stubbornly litigious, or has caused the plaintiff unnecessary trouble and
> expense, the jury may allow them.

This provision is codified in Title 13 of the Code, which is labeled "Contracts[,]" and in Chapter 6 thereof, which is labeled "Damages and Costs Generally[.]" Nonetheless, Georgia's appellate courts have long held that awards pursuant to OCGA § 13-6-11 are available not only when the underlying substantive claims are based on contracts, but also when they are based on torts.[21] Indeed, as the Supreme Court noted earlier this year, "[t]he majority of the cases in which we have considered claims for litigation expenses under OCGA § 13-6-11 or its predecessor have involved claims arising in tort."[22] TCA contends that based on the 2021 amendments to OCGA §§ 1-1-1 and 1-1-8, this "interpretation" is no longer permissible. We disagree.

Until 2021, OCGA § 1-1-1 provided as follows:

> The *statutory portion* of the codification of Georgia laws prepared by the
> Code Revision Commission and the Michie Company [now known as
> LexisNexis®] pursuant to a contract entered into on June 19, 1978, is

---

[21] See *Junior v. Graham*, 313 Ga. 420, 425 (2) (b) (870 SE2d 378) (2022) (affirming award of attorney fees and litigation expenses under OCGA § 13-6-11 as part of damages in a tort case).

[22] *Love v. McKnight*, 321 Ga. 196, 199 (2) n.6 (913 SE2d 614) (2025).

enacted and *shall have the effect of statutes enacted by the General Assembly of Georgia.*[23]

Additionally, until 2021, OCGA § 1-1-7 provided:

*the descriptive headings or catchlines immediately preceding or within the text of the individual Code sections* of this Code, except the Code section numbers included in the headings or catchlines immediately preceding the text of the Code sections, . . . *do not constitute part of the law and shall in no manner limit or expand the construction of any Code section.*[24]

As of 2021, OCGA § 1-1-1 now provides:

(a) The statutory portion of the codification of Georgia laws prepared by the Code Revision Commission and the Michie Company pursuant to a contract entered into on June 19, 1978, is enacted and shall have the effect of statutes enacted by the General Assembly of Georgia. The statutory portion and numbering and arrangement of such codification, along with supplementary content determined to be useful to users, shall be published by the state and

---

[23] (Emphasis supplied.)

[24] (Emphasis supplied.); See *Ga. Govt. Transparency & Campaign Finance Commn. v. New Ga. Project Action Fund*, 359 Ga. App. 32, 35 (2) (a) n.4 (856 SE2d 733) (2021) (rejecting party's reliance on the descriptive label of a statute — the fact that OCGA § 50-13-13 was labeled "Contested cases; notice; hearing; record; powers of hearing officer" — and concluding that the statute's reference to "proceedings before the agency" included not only contested cases but also an agency's investigations).

when so published shall be known and may be cited as the "Official Code of Georgia Annotated."

(b) The following matter contained in the Official Code of Georgia Annotated, including all supplements and revised volumes thereof, *shall be considered enacted by the General Assembly: (1) Statutory text; and (2) Arrangement and numbering system,* including, but not limited to, title, chapter, article, part, subpart, Code section, subsection, paragraph, subparagraph, division, and subdivision numbers and designations.

(c) The following matter contained in the Official Code of Georgia Annotated, including all supplements and revised volumes thereof, shall not be considered enacted by the General Assembly, shall bear no additional weight or effect, and shall not be construed to have the imprimatur of the General Assembly by virtue of such inclusion in the Official Code of Georgia Annotated: (1) Case annotations; (2) Research references . . . ; *(3) Captions; (4) Catchlines; (5) Headings*; . . . and (21) Any other matter published in the Official Code of Georgia Annotated which is not included in subsection (b) of this Code section.[25]

The 2021 amendments also added the following new subsection to OCGA § 1-1-8:

(f) Nothing in this Code section shall be construed to mean that any matter contained in the Official Code of Georgia Annotated has any force of law or imprimatur of the State of Georgia except as provided for in Code Section 1-1-1.

---

[25] (Emphasis supplied.)

TCA argues that because the "arrangement and numbering system" now carries the force of law, the only reasonable interpretation of the placement of OCGA § 13-6-11 in Chapter 6 of Title 13 is that its application is limited to contract cases. But to the extent the label of Chapter 13 — "Contracts" — should be treated as part of the Code's "arrangement and numbering system" such that it informs how § 13-6-11 should be construed, that is not new.[26] It appears to be true that, prior to 2021, no Code section explicitly addressed whether the Code's "arrangement and numbering system" carried the force of law. However, as C. P. points out in her response brief — and TCA expressly acknowledges in its reply — the reviser bills that were passed by the General Assembly each year did address this issue, as they provided that "[t]he text of Code sections and title, chapter, article, [etc.] numbers and designations . . . shall have the effect of statutes enacted by the General Assembly of Georgia."[27] Thus, both before and after the 2021 amendments, Georgia law provided that title and

_____

[26] Additionally, it is not entirely clear to us that the label of Title 13 should be treated as part of the "arrangement and numbering system" rather than as a heading, caption, or catchline. But with respect to those parts of a statute as well, nothing in the 2021 amendments changed how they should be treated. As demonstrated above, both before and after the 2021 amendments, Georgia law provided that headings, captions, and catchlines are not to be treated as enacted by the General Assembly.

[27] See, e.g., Ga. L. 1983, p. 4.

chapter numbers and designations must be treated as enacted by the General Assembly.[28] Under these circumstances, we are not persuaded that the 2021 amendments had any effect on the degree to which the label of the Title or Chapter where a statute is codified should inform the construction of that statute. We therefore reject TCA's argument that the 2021 amendments upend our longstanding precedent regarding the availability of OCGA § 13-6-11 awards in tort cases.

---

[28] In a similar vein, it is well-established that the context of a statutory provision can be a telling factor as to how it should be construed. See *Johnson v. State*, 308 Ga. 141, 144-145 (839 SE2d 521) (2020) (When construing a statute, courts "must view the statutory text in the context in which it appears[; thus,] we may look to other provisions of the same statute, the structure and history of the whole statute, and the other law — constitutional, statutory, and common law alike — that forms the legal background of the statutory provision in question.") (citations and punctuation omitted); *City of Guyton v. Barrow*, 305 Ga. 799, 805 (2) (828 SE2d 366) (2019) ("[W]hen interpreting legal text, [courts] do not read words in isolation, but rather in context . . . , which includes the structure and history of the text and the broader context in which that text was enacted, including statutory and decisional law that forms the legal background of the written text.") (citations and punctuation omitted); *Ga. Govt. Transparency*, 359 Ga. App. at 33 (2) ("This Court looks to the text of the provision in question and its context within the larger legal framework to discern the intent of the legislature in enacting it.") (citation and punctuation omitted); *Waters v. Roberts*, 116 Ga. App. 620, 622 (158 SE2d 428) (1967) (stating that the provision's "particular placement" after certain preceding subsections was informative as to its meaning).

2. TCA argues that the trial court erred in denying its motion to dismiss C. P.'s other negligence and nuisance claims. Before we address the viability of those claims, we recognize that

> a motion to dismiss for failure to state a claim upon which relief may be granted should not be sustained unless (1) the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought. If, within the framework of the complaint, evidence may be introduced which will sustain a grant of the relief sought by the claimant, the complaint is sufficient and a motion to dismiss should be denied. In deciding a motion to dismiss, all pleadings are to be construed most favorably to the party who filed them, and all doubts regarding such pleadings must be resolved in the filing party's favor. On appeal, a trial court's ruling on a motion to dismiss for failure to state a claim for which relief may be granted is reviewed de novo.[29]

*(a) Negligence Per Se*

Generally, a plaintiff may assert a claim of negligence per se arising from violations of federal or state statutes as long as (1) that plaintiff falls within the class of persons the statute was intended to protect; (2) the

---

[29] (Citations and punctuation omitted.) *GeorgiaCarry.Org, Inc. v. Atlanta Botanical Garden, Inc.*, 299 Ga. 26, 28 (1) (785 SE2d 874) (1) (2016).

harm complained of was the same harm the statute was intended to guard against; and (3) the violation of the statute proximately caused the plaintiff's injury.[30]

TCA contends that C. P.'s claim for negligence per se should have been dismissed because C. P. did not identify any particular statute or regulation that TCA violated. But the trial court found that "[a]t the motion to dismiss stage, the failure to include a specific statute, ordinance, or rule is not fatal to a negligence per se claim (and is likely remedied by a more definite statement)." TCA does not challenge that statement of law on appeal, and instead argues that this principle illustrates the flaws in how Georgia law resolves motions to dismiss and urges us to adopt federal precedent. We, however, are not authorized to do so.[31] And under the "no set of

---

[30] *McLain v. Mariner Health Care, Inc.*, 279 Ga. App. 410, 411 (2) (631 SE2d 435) (2006); see also OCGA § 51-1-6 ("When the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby.").

[31] See Ga. Const. of 1983, Art. VI, Sec. VI, Par. VI; *Pak v. Ga. Dept. of Behavioral Health & Developmental Disabilities*, 317 Ga. App. 486, 488 (731 SE2d 384) (2012) ("[T]his Court has no authority to overrule or modify a decision made by the Supreme Court of Georgia[.]").

facts" standard that applies to motions to dismiss under Georgia law,[32] we agree with the trial court that C. P.'s claims of negligence per se are sufficient to survive the motion to dismiss.

### (b) Negligent Employment

C. P.'s claims of negligent hiring, training, retention, and supervision (collectively, her "negligent employment claims") are based on the principle that "[a]n employer is bound to exercise ordinary care in the selection of employees and not to retain them after knowledge of incompetency."[33]

TCA argues that C. P.'s negligent employment claims should be dismissed because C. P. has not alleged that the rape was committed by an employee of TCA who had a tendency or propensity to rape residents of the Tuscany Condominiums. As the trial court observed, however, the better question is whether the complaint establishes with certainty that the assailant was *not* an employee of TCA.

More importantly, C. P. is not required to show that the assailant was an employee of TCA to establish claims for negligent employment. Instead, she must

---

[32] See *GeorgiaCarry.Org.*, 299 Ga. at 28 (1).

[33] (Punctuation omitted.) *Munroe v. Universal Health Svcs., Inc.*, 277 Ga. 861, 862 (1) (596 SE2d 604) (2004) (quoting OCGA § 34-7-20).

show that TCA was negligent in hiring, training, retaining, or supervising an employee whose incompetence contributed to her injury.[34]

In her complaint, C. P. alleges, inter alia, that TCA employees knew or should have known of issues with loitering, suspicious persons, and vehicle thefts and break-ins in the parking lot and common area of the Condominiums — including that unauthorized persons accessed the property through the faulty gate. She further alleges that, despite such knowledge, the employees failed to repair the gate, failed to implement and follow adequate safety measures, and failed to secure the premises. Within the framework of those allegations, C. P. may be able to establish that TCA negligently hired, trained, retained, or supervised an individual who had a tendency to perform security-related job functions poorly, and that such negligence contributed to her injury.

*(c) Negligent Entrustment*

---

[34] See *Doe v. Young Women's Christian Assn. of Greater Atlanta, Inc.*, 321 Ga. App. 403, 408 (2) (740 SE2d 453) (2013) ("An employer has a duty to exercise ordinary care not to hire or retain an employee the employer knew or should have known posed a risk of harm to others where it is reasonably foreseeable that the employee's tendencies could cause the type of harm sustained by the plaintiff. . . . [And to prevail] on a claim for negligent training and supervision, a plaintiff must produce some evidence of incidents similar to the behavior that was the cause of the injury at issue.") (citation and punctuation omitted).

"Under the doctrine of negligent entrustment, a party is liable if he entrusts someone with an instrumentality, with actual knowledge that the person to whom he has entrusted the instrumentality is incompetent by reason of his age or inexperience, or his physical or mental condition, or his known habit of recklessness."[35]

TCA contends C. P.'s claim for negligent entrustment must be dismissed because the complaint alleges that TCA negligently entrusted the Condominium "premises" to unidentified employees or agents, and this theory of liability cannot apply because real property is not an instrumentality that can be entrusted to a person. The trial court recognized this rule, but concluded that C. P. was not required to identify what instrumentality was entrusted at this stage of the case. On appeal, TCA argues that because the complaint did not refer to any other possible "instrumentality," this claim cannot proceed. TCA also notes that during the motions hearing, C. P. refused to identify the instrumentality at issue.

To survive a motion to dismiss, a complaint does not need to set forth all the elements of a cause of action.[36] Rather, the question is whether, "within the

---

[35] (Citation and punctuation omitted.) *Danforth v. Bulman*, 276 Ga. App. 531, 535 (2) (623 SE2d 732) (2005).

[36] See *Mitchell v. Capehart*, 353 Ga. App. 461, 463 (838 SE2d 125) (2020).

framework of the complaint, evidence may be introduced which will sustain a grant of the relief sought by the claimant[.]"[37] We therefore agree with the trial court that, at this stage of the case, C. P. was not required to identify what particular "instrumentality" was negligently entrusted by TCA. And TCA has not established that, within the framework of C. P.'s complaint, there is no possible set of facts to sustain a negligent entrustment claim.

*(d) Negligent Misrepresentation*

"The elements of a claim for negligent misrepresentation are: (1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance."[38]

Here, C. P. alleged that "Defendants negligently represented to their invitees, including Plaintiff, that the property at issue was properly maintained." In its order on TCA's motion to dismiss, the trial court ordered C. P. to file a more definite

---

[37] (Citation and punctuation omitted.) *GeorgiaCarry.Org*, 299 Ga. at 28 (1).

[38] (Citation and punctuation omitted.) *Liberty Capital, LLC v. First Chatham Bank*, 338 Ga. App. 48, 54 (2) (a) (789 SE2d 303) (2016).

statement of this claim.[39] C. P. did so; in her amended complaint, she alleges that the Defendants misrepresented that the security gates were properly repaired and maintained. TCA then filed a motion to dismiss the re-pleaded claim, which motion remains pending in the trial court.

On appeal, TCA argues that even though the trial court has not ruled on whether the re-pleaded claim is subject to dismissal, we should hold that it must be dismissed because any statement that a property is properly maintained is too indefinite to serve as the basis for a negligent misrepresentation claim. We disagree. The re-pleaded claim alleges that despite the Defendants' representations to the contrary, the security gates were not functioning, and the trial court has not yet ruled on the question of whether such an assertion is too indefinite to support a negligent misrepresentation claim. "[A]s a court for the correction of errors, we cannot reach this issue because it was not ruled on below."[40]

*(e) Nuisance*

---

[39] See OCGA § 9-11-9 (b) ("In all averments of fraud or mistake, the circumstance constituting fraud or mistake shall be stated with particularity.").

[40] *Ga. Div., Sons of Confederate Veterans v. Downs*, 370 Ga. App. 669, 675 (2) (898 SE2d 850) (2024).

To prevail on a nuisance claim, the plaintiff must establish that the "defendant created or maintained a continuous or regularly repeated act or condition on the property, which led to the plaintiff's injury."[41]

Here, C. P.'s nuisance claim is based on the allegation that the defendants allowed the dangerous environment at Tuscany Condominiums to worsen and continue. TCA contends the nuisance claim must be dismissed because it is "redundant" to the premises liability claims. Under Georgia's liberal pleading rules, however, a plaintiff is entitled to set forth two or more alternative statements of a claim.[42] Additionally, although a plaintiff cannot receive a double recovery of the same damages for the same wrong, a plaintiff may pursue any number of remedies against the same person and does not need to elect between them prior to formulation and

---

[41] (Citation and punctuation omitted.) *Camelot Club Condo. Assn., Inc. v. Afari-Opoku*, 340 Ga. App. 618, 628 (1) (b) (798 SE2d 241) (2017).

[42] See OCGA § 9-11-8 (e) (2) ("A party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses. . . . A party may also state as many separate claims or defenses as he has[.]"); *Coen v. Aptean, Inc.*, 356 Ga. App. 468, 472 (3) (847 SE2d 835) (2020) (same).

entry of judgment.[43] The redundancy of this claim is, therefore, not a valid basis for dismissal.

TCA also argues that third-party crime should not be permitted to serve as the basis for a nuisance claim because there is no way for a property owner to stop such activity unilaterally. But as the trial court observed, the Court has recognized that a property owner can be liable under a nuisance theory if the owner allows "continuous or regularly repeated" criminal activity.[44] We decline TCA's invitation to revisit that precedent.

For the foregoing reasons, we conclude that the trial court properly denied TCA's motion to dismiss.

3. Finally, TCA argues that the trial court erred in denying TCA's request for the court to order C. P. to submit to a mental examination. TCA brought its motion under OCGA § 9-11-35 (a), which provides:

---

[43] See OCGA § 9-2-4 ("A plaintiff may pursue any number of consistent or inconsistent remedies against the same person or different persons until he shall obtain a satisfaction from some of them."); *Tankersley v. Barker*, 286 Ga. App. 788, 790-791 (2) (651 SE2d 435) (2007) (same).

[44] See, e.g., *Bethany Group, LLC v. Grobman*, 315 Ga. App. 298, 302 (2) (727 SE2d 147) (2012).

When the mental or physical condition . . . of a party[ ] . . . is in controversy, the court in which the action is pending may order the party to submit to a physical examination by a physician or to submit to a mental examination by a physician or a licensed psychologist[.] The order may be made only on motion for good cause shown[.]

"The grant or denial of a motion requesting such an examination rests in the sound discretion of the trial court."[45]

TCA is correct that, by asserting mental injuries, C. P. placed her mental condition in controversy and provided TCA with good cause to investigate the existence and extent of her injuries.[46] However, under the clear terms of OCGA § 9-11-35 (a),

the granting of an order for physical [or mental] examination is permissive, not mandatory, and may be entered only for good cause shown. What is sufficient to fulfill that criterion rests in the broad discretion of the trial judge. A relevant factor in this determination is the ability of the movant to obtain the desired information by other means.[47]

---

[45] (Citation and punctuation omitted.) *Morris v. Turnkey Med. Eng., Inc.*, 317 Ga. App. 295, 301 (2) (a) (729 SE2d 665) (2012).

[46] See *Morris*, 317 Ga. App. at 300 (2) (a).

[47] (Citation and punctuation omitted.) *Courtesy Ford, Inc. v. Campbell*, 359 Ga. App. 472, 474 (858 SE2d 760) (2021).

Here, at the hearing on TCA's motion, C. P.'s attorney advised the trial court that she intended to produce medical records for TCA's review and that she had not done so before the hearing because TCA's filing of the motion to dismiss triggered a stay of discovery. In light of those representations, the trial court did not abuse its discretion by denying TCA's motion.[48]

*Judgment affirmed. Brown, C. J., and Barnes, P. J. concur.*

---

[48] See *Courtesy Ford*, 359 Ga. App. at 474 ("[A] trial court does not abuse its broad discretion in denying a motion for examination when medical records are available to the defendant.").